# IN THE SUPREME COURT OF THE STATE OF IDAHO

**Docket No. 36601**

|  |  |  |
|---|---|---|
| HARRIS, INC., an Idaho corporation, | ) | |
| | ) | |
| Plaintiff-Counterdefendant-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FOXHOLLOW CONSTRUCTION & | ) | |
| TRUCKING, INC., an Idaho corporation, | ) | |
| L.N. JOHNSON PAVING, LLC, a limited | ) | Idaho Falls, August 2011 Term |
| liability company, | ) | |
| | ) | 2011 Opinion No. 109 |
| Defendants-Respondents, | ) | |
| | ) | Filed: November 2, 2011 |
| and | ) | |
| | ) | Stephen W. Kenyon, Clerk |
| DAVID EGAN, an individual, FERGUSON | ) | |
| FARMS, d/b/a FERGUSON TRUCKING, D. | ) | |
| KYM FERGUSON, an individual, and | ) | |
| MICHAEL FERGUSON, an individual, | ) | |
| | ) | |
| Defendants-Counterclaimants- | ) | |
| Respondents. | ) | |
| _____ | ) | |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Jefferson County. Honorable Darren B. Simpson, District Judge.

The judgment of the district court is <u>affirmed in part</u> and <u>vacated in part</u>.

Norman G. Reece, Jr., P.C., Chubbuck, argued for appellant.

Cox, Ohman & Brandstetter, Idaho Falls, for respondent L.N. Johnson Paving, LLC. John M. Ohman argued.

William H. Mulberry, Ririe, argued for respondent Fergusons.

David Egan, Idaho Falls, respondent pro se.

_____

J. JONES, Justice.

This case involves an action for breach of contract and attendant claims of breach of the covenant of good faith and fair dealing, unjust enrichment, fraud, and indemnification. After a bench trial, Harris, Inc. (Harris), the plaintiff, lost on all claims. We affirm the district court's judgment, except for its attorney fee awards, which we vacate.

## I.
## BACKGROUND

In early 2002, David Egan, a business manager for Foxhollow Construction and Trucking, Inc.[1] (Foxhollow),  met with Wayne Johnson (Wayne) of L.N. Johnson Paving, LLC (Johnson) to discuss a bid for excavation and paving work for a new public high school in Fremont County (the Fremont Project). Egan wanted to bid on the Fremont Project on behalf of Foxhollow, but Foxhollow lacked the requisite public works license. Johnson had a public works license for contracts up to $500,000.00.  Wayne thought Johnson's license could cover Foxhollow if Johnson and Foxhollow submitted a single bid in Johnson's name.  So, Egan submitted a subcontract bid in Johnson's name to Harris, a general contractor, for the Fremont Project's excavation, filling, grading, culvert, and asphalt paving work.  Wayne and Egan planned for Johnson to handle the paving work and for Foxhollow to do the excavation, filling, grading, and culvert work.

Foxhollow and Johnson had a relationship with Harris before the Fremont Project.  Both companies worked on the Midway Middle School project in Rigby under an arrangement similar to the one they planned for the Fremont Project.  Foxhollow also was working independently for Harris on a separate contract for a water and sewer project in Jefferson County (the Jefferson Project).  Johnson had worked independently on the Jefferson Project as well.

Johnson was the successful bidder for Harris' paving and excavation subcontract on the Fremont Project. Egan, Wayne, and Scott Harris (Scott), acting for Harris, met at Harris' offices in Chubbuck to discuss the bid and the subcontract.  Egan and Wayne, despite placing a single bid, asked Scott to write out separate contracts for Foxhollow and Johnson—the "site work portion" in Johnson's name, and the "structural excavation of the building" in Foxhollow's name.  In mid-June 2003, Fremont County Joint School District awarded Harris the construction contract for the

---

[1] Foxhollow Construction and Trucking, Inc. is a now-defunct Idaho corporation.  The district court dismissed Foxhollow from the case for lack of notice because there was no indication it was served.

Fremont Project. Harris started work on the Fremont Project soon thereafter. In late June 2003, Egan, acting on Johnson's behalf, signed a contract with Harris for excavation, filling, grading, culvert, and paving work on the Fremont Project. Under that contract, Harris agreed to pay Johnson $409,363.00, much of which was earmarked for Foxhollow's excavation, filling, grading, and culvert work. Demian Egan, as Foxhollow's president, signed a separate contract with Harris in July 2003 for $245,705.00 for excavation, filling, grading, and culvert work. The ultimate contractual arrangement and division of work between Foxhollow and Johnson is unclear because both companies had written agreements describing much of the same work.[2] But, it is clear that Harris paid Johnson for work on the Fremont Project and Johnson forwarded those payments to Foxhollow. In addition, Harris paid some of Foxhollow's payroll to avoid Foxhollow's potential mismanagement of its cashflows.[3] Egan was one of the Foxhollow employees that Harris paid directly.

Egan requested progress payments for billing, payroll, and other incurred expenses, near the end of each month while Foxhollow and Johnson were involved with the Fremont Project. Melvin Voss, a Foxhollow employee, kept track of the rented equipment Foxhollow used on the Fremont Project. Foxhollow's equipment suppliers sent invoices to Voss. In turn, Voss submitted the invoices to Tony Robles, a Harris employee. Harris would not make progress payments until all materialmen and equipment suppliers were paid. Harris issued payments based on communications with Egan and Voss.

In early August 2002, Harris agreed to a change order, which added $16,500.00 to Johnson's subcontract. With this change, Johnson's subcontract totaled $425,863.00. Then, in September 2002, Harris agreed to a second change order, which added $41,983.20 to Johnson's

---

[2] Scott knew Foxhollow did not have a public works license. And as the district court pointed out, "subcontracting more than eighty percent (80%) of the work under any contract to be performed by him" as a public works contractor was illegal. I.C. § 54-1902(2). Furthermore, it is "unlawful for any public works contractor to: (a) Accept a bid from any person who at that time does not possess the appropriate license for the project involved; or (b) Accept bids to sublet any part of any contract for specialty construction from a specialty contractor who at that time does not possess the appropriate license." I.C. § 54-1902(3). This latter requirement, that a contractor have a license before bidding, is waived, in part, for contracts funded by federal funds, but any successful contractor must ultimately obtain a license. I.C. § 54-1902(4).

[3] The district court found that Harris claimed Egan and Melvin Voss, another Foxhollow employee, on Harris' tax returns in order to derive an unjust tax benefit. The court concluded that Egan and Voss were never employed by Harris.

3

subcontract, for a new total of $467,846.20. Shortly after the second change order, in mid-September 2002, Scott received letters from two equipment suppliers demanding payment for rental equipment Foxhollow used on the Fremont Project. Pro-Rentals & Sales, Inc. demanded $7,781.01[4] and Western States, Inc. demanded $51,000.00. At the same time, Foxhollow owed Ferguson Farms, in which Kym Ferguson (Kym) was a partner,[5] about $75,000.00 for leased equipment.

Neither Johnson nor Foxhollow notified Harris of any accounts owing for any rental equipment. In late September 2002, Scott did receive a letter from Foxhollow's lawyers stating that Foxhollow had paid all equipment suppliers except Western States and that Foxhollow was not in default on its obligations on the Fremont Project. Harris, relying on this letter, sent no payment to Pro-Rentals. Rather, Harris issued another round of payroll checks to Foxhollow employees for work on the Fremont Project. Then, just one week later, on September 27, 2002, Scott sent a letter to Wayne notifying him that Johnson and Foxhollow were in default on the Fremont Project. Scott apparently proposed a schedule to cure the default. Johnson never responded to Scott's letter. In late September 2002, Ferguson Farms took its equipment off the Fremont Project. The trial court was unable to discern which party, Foxhollow or Johnson, defaulted on specific aspects of the agreement because the contracts with Harris had no clear division of work. Johnson itself did not perform any work on the Fremont Project. In early October 2002, Scott and Kym agreed that Ferguson Farms would return Ferguson's equipment to the Fremont Project and Harris would pay Ferguson Farms directly, rather than through Foxhollow. Ferguson Farms worked on the Fremont Project for the most part in October 2002. Harris paid Ferguson Farms for work in March 2004, after Ferguson Farms threatened Harris with a lawsuit.

In mid-December 2002, despite the apparent default, Harris sent Johnson a check, payable to Johnson and L&M leveling, for $8,000.00 for some of Foxhollow's work on the Fremont Project. Johnson's lawyer returned the check with a letter denying that Johnson ever had a contract

---

[4] This amount was for equipment Foxhollow used on the Fremont Project and the Jefferson Project.

[5] D. Kym Ferguson and Michael Ferguson were partners in Ferguson Farms. Ferguson Farms, doing business as Ferguson Trucking, was one of Foxhollow's equipment suppliers. Kym and Michael Ferguson were also officers of Foxhollow until late September 2002, when they resigned from the Foxhollow board and sold their Foxhollow stock.

with Harris for the Fremont Project and denying any knowledge of L&M Landleveling.[6]

Harris subsequently brought this action, alleging that (1) Foxhollow, Johnson, and the Fergusons (Kym, Michael and Ferguson Farms) breached their subcontracts with Harris; (2) the defendants were unjustly enriched as a result of their unsatisfied obligations; (3) the defendants breached duties of good faith and fair dealing owed to Harris under the contracts; (4) the defendants made fraudulent representations to Harris; and (5) Harris is entitled to indemnification from Foxhollow and Johnson for an earlier judgment entered against Harris. Egan filed a counterclaim for indemnification from Harris. The Fergusons filed a counterclaim alleging that Harris breached an equipment rental contract that Harris had with them.

The district court dismissed Foxhollow as a party for lack of proof of notice because there was no indication that Foxhollow was ever served. After a bench trial, the court held that Harris had abandoned its claims against the Fergusons for breach of contract, breach of the covenant of good faith and fair dealing, and indemnification. The court granted Harris' motion for "directed verdict" as to Egan's counterclaim, and it granted Harris summary judgment as to the Fergusons' counterclaim. Finally, the court concluded that Harris failed to prove any of its remaining claims against any of the defendants and therefore was not entitled to relief. The court denied Harris' motion for a new trial. The court also awarded fees and costs to Johnson and the Fergusons. Harris timely appealed.

Harris now argues that the district court: (1) erred in concluding Harris failed to prove contract damages; (2) erred in concluding that no defendant was unjustly enriched; (3) erred in concluding that no defendant is liable for fraud; (4) erred in concluding that Harris was not entitled to indemnity; (5) abused its discretion in denying Harris' motion to amend findings and conclusion; (6) abused its discretion in granting fees and costs to Johnson and the Fergusons; and (7) abused its discretion in denying Harris' motion for a new trial.

## II.
## DISCUSSION

Although Harris asserts numerous claims of error, the main thrust of its argument is that the district court erred in concluding the evidence it submitted regarding damages was insufficient. The district court observed that Harris was likely entitled to damages against Johnson for breach of

---

[6] It is unclear from the record who L&M Landleveling is.

5

contract but that Harris had failed to adequately establish any specific amount of damages attributable to Johnson's breach. We find no error in the district court's conclusion.

A.      **Standard of Review.**

We review a district court's bench trial decisions to determine "whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law." *Independence Lead Mines v. Hecla Mining Co.*, 143 Idaho 22, 26, 137 P.3d 409, 413 (2006). This Court will set aside findings of fact only when clearly erroneous. *Id.* We will not disturb findings supported by substantial and competent evidence, "even if the evidence is conflicting." *Id.* "It is the province of the district court to weigh conflicting evidence and testimony and to judge the credibility of the witnesses." *Thorn Springs Ranch, Inc. v. Smith*, 137 Idaho 480, 484, 50 P.3d 975, 979 (2002). We, therefore, liberally construe a trial court's findings "in favor of the judgment entered." *Id.* (internal quotation marks omitted). When it comes to matters of law, however, we are not bound by the trial court's conclusions; this Court is free to "draw its own conclusions from the facts presented." *Id.*

B.      **The district court did not err in concluding that Harris failed to prove contract damages.**

1.      **Harris failed to prove contract damages against Johnson.**

The district court concluded that Harris and Johnson had a contract for the Fremont Project and that the contract included an implied covenant of good faith and fair dealing. The court determined that Johnson failed to finish its work under its contract and therefore breached. The court also determined that Johnson breached the implied duty of good faith because Johnson claimed that no contract for the Fremont Project ever existed. At trial, it was undisputed that Harris suffered damages as a result of Johnson's failure to perform. But the court found Harris' evidence too speculative to attribute any amount of damages to Johnson.

Scott testified that Harris incurred a cost of "around $147,000.00" to finish the Fremont Project paving after Johnson breached. Harris also supported its damage claim with a document entitled "Job Cost Ledger – Financial Analysis." The district court found that even though the ledger does list payments to Johnson, Foxhollow, and Egan, there are no dates to indicate when payments were made. The court also noted that the ledger shows the Johnson subcontract as being only 63% complete, "despite the fact that the 'data date' was December 31, 2003." The

6

court acknowledged that Harris submitted a "Continuation Sheet," which Harris claimed evidenced its damages, but the court observed that the Continuation Sheet was for work completed through August 31, 2002. Thus, the court concluded that Harris did not prove how much it spent to complete Johnson's work. The court noted also that Harris did not offer any "third-party invoices of labor, supplies or materials needed to finish the Jo[h]nson subcontract." Accordingly, the court held that Harris failed to prove any damages suffered because of Johnson's breach and therefore was not entitled to recover.

On appeal, Harris argues that its evidence did prove damages. First, Harris contends that the Continuation Sheets, when coupled with Scott's testimony, imply that Harris paid Johnson for work that Johnson never performed. Harris also asserts that a number of documents it introduced in evidence, when viewed together, prove damages. Harris further attributes the settlement payment it made to the Fergusons in March 2004 to Johnson's breach. Harris also argues that a money judgment it paid Pro Rentals because of unpaid rental equipment was due to Johnson's breach. Finally, Harris contends that Scott's testimony as to Harris' damages was not speculative because it was based on his personal knowledge. All of this evidence, according to Harris, "clearly show[s] several examples of damages [Harris] incurred." At oral argument, counsel for Harris stated that in a motion in the district court he attempted to "step the court through what . . . the evidence showed as to the precise amounts of damages." And Harris' counsel tried to explain to the Court just how each of those documents added up to prove damages.

At trial, Johnson denied ever making a contract with Harris, but in this Court Johnson apparently concedes that a contract existed or, at least, did not dispute the district court's conclusion in that regard. Johnson only argues that Harris failed to prove damages with any sort of accuracy. Johnson focuses on the imprecise language Scott used to describe Harris' damages after Johnson's breach. Johnson also reiterates the district court's finding that Harris failed to produce any invoices or receipts from third parties that tend to prove damages.

Harris' arguments are unavailing because Harris simply asks this Court to retry the facts. Our deferential review requires a liberal construction of the evidence in favor of the judgment entered. Even if Harris' evidence could support other findings—which does not appear to be the case—this Court will not disturb the trial court's findings that are supported by substantial and

competent evidence. The district court's analysis of the documents submitted in evidence was succinct and accurate. The evidence does not indicate when payments were issued to Johnson, nor is there any evidence of payments to third parties made because of Johnson's breach. In its opinion denying Harris' motion to amend, the court pointed out that it was not even clear from the evidence when Johnson defaulted on its subcontract. Furthermore, the district court concluded that testimony about damages was speculative. That court had the opportunity to, and based on its detailed findings did, weigh all the evidence before it. The court's findings were consistent with that evidence and thus not clearly erroneous.

The facts in the record support only one conclusion: Harris' contract action against Johnson fails because Harris failed to prove up its claim for damages. "The burden is upon the plaintiff to prove not only that it was injured but that its injury was the result of the defendant's breach; both amount and causation must be proven with reasonable certainty." *Griffith v. Clear Lakes Trout Co., Inc.*, 143 Idaho 733, 740, 152 P.3d 604, 611 (2007). "Reasonable certainty" does not mean that damages need to be proven with "mathematical exactitude," but it does require a plaintiff to prove that damages are not merely speculative. *Id.* Here, the facts indicate that Harris had to hire a third-party to finish work under Johnson's contract. But there is no evidence to prove, with reasonable certainty, the amount Harris paid that third party. Scott's testimony that Harris spent "around $147,000.00" to "finish" Johnson's work does not prove damages with reasonable certainty. There are no invoices from, or evidence of payments to, another subcontractor that Harris hired to fulfill Johnson's obligations. Because there was an overlap between the Johnson subcontract and the Foxhollow contract and no clear explanation in documentary evidence or trial testimony as to which entity failed to complete what work, it would not be possible to determine the allocation of damages between the two entities even if Harris' documents did contain accurate damage information. Accordingly, Harris' breach of contract claim against Johnson fails for lack of proper proof of damages.

Harris' claim for breach of the covenant of good faith and fair dealing against Johnson also fails. Because the covenant is implied in contract, it results in contract damages. *Bybee v. Isaac*, 145 Idaho 251, 260, 178 P.3d 616, 625 (2008). As discussed, Harris failed to prove its contractual damages arising from Johnson's breach. So, Harris' claim for breach of the covenant of good faith and fair dealing against Johnson cannot succeed.

### 2. The district court did not abuse its discretion by refusing to admit Harris' Exhibits 55 and 55-A.

Harris also argues that the district court erred in refusing to admit Harris' Exhibits 55 and 55-A, which Harris contends are supportive of its claim for damages. We review a trial court's decision whether to admit or exclude evidence under an abuse of discretion standard. *Slack v. Kelleher*, 140 Idaho 916, 924, 104 P.3d 958, 966 (2004). Whether there is a proper foundation upon which to admit evidence is a matter within the trial court's discretion. *Id.* at 921, 104 P.3d at 963.

Exhibit 55 was apparently a printed "job cost journal" that had some hand-written annotations on it. Upon objection by Johnson and the Fergusons, the trial judge declined to admit Exhibit 55 because of concerns about its authenticity. While attempting to authenticate Exhibit 55, Harris' counsel asked Scott who had written on the document. Scott testified, "I may have. I'm not a hundred percent sure." When asked whether a Harris employee made the annotation, Scott said, "It, it [sic] probably was either me or Cindy." Harris contends Scott's testimony that "the handwriting on the exhibit was probably his own or that of a Harris employee—and not anyone outside of Harris, Inc.," should have satisfied any authenticity concerns the trial judge had.

Harris' argument is unavailing. The trial judge declined to admit Exhibit 55 because Harris was unable to identify with certainty who altered the document with the handwriting. According to the judge, "we don't know who added the handwriting or where they got their information." The judge sustained the objection to admission of Exhibit 55 because of his concern about the "reliability of the accuracy of that document and the information that's handwritten on there, which alters the original document." Authentication or identification of documentary evidence is a condition precedent to its admissibility. I.R.E. 901. The district court was not satisfied with the testimony Harris presented in support of admission of the document. This was a matter squarely within the judge's discretion and there is no indication he abused that discretion. Thus, the court's refusal to admit Exhibit 55 was not error.

Harris also offered Exhibit 55-A, which was a version of Exhibit 55 that did not contain the handwritten annotations. The trial judge declined to admit Exhibit 55-A because Harris had not disclosed it to opposing counsel before trial, as required by the court's Scheduling Order.

The court recognized that Exhibit 55-A probably was a business record, but was concerned that the defendants did not have time to conduct discovery in light of information contained in the exhibit.

Harris argues that it "indicated to the court that most, if not all, the documents" that supported the figures and calculations of Exhibit 55-A had been disclosed during discovery. Harris also contends that it made all the files in Scott's possession available to each defendant during Scott's deposition. And, Harris argues that it did include a version of Exhibit 55-A in its pre-trial exhibit disclosures—namely, Exhibit 55—in accordance with the court's Scheduling Order, and therefore Exhibit 55-A should have been admitted. Finally, Harris states that Exhibit 55 should have been admitted because the court admitted another exhibit that defense counsel also objected to as late or violative of the court's Scheduling Order. Johnson counters by simply reiterating that Harris failed to comply with the Scheduling Order and so the court was correct to exclude Exhibit 55-A.

Harris' argument is again of no avail. Harris did not show how the district court abused its discretion in declining to admit Exhibit 55-A. Moreover, a trial judge may impose sanctions on parties for failing to follow the judge's scheduling orders. I.R.C.P. 16(i). Among the available sanctions is an order "prohibiting [a] party from introducing designated matters in evidence." *Id.* at 37(b)(2)(B). Thus, the trial judge here had authority to exclude Exhibit 55-A as a procedural matter, irrespective of evidentiary considerations, once he determined that Harris failed to comply with his Scheduling Order. Accordingly, the court did not abuse its discretion in refusing to admit Exhibit 55-A.

### C. The district court did not err in concluding that Harris failed to prove that any of the defendants was unjustly enriched.

In the district court, Harris alleged that Johnson, Egan, and Kym Ferguson were all unjustly enriched as a result of Foxhollow and Johnson's breach of contract. "The elements of unjust enrichment are that (1) a benefit is conferred on the defendant by the plaintiff; (2) the defendant appreciates the benefit; and (3) it would be inequitable for the defendant to accept the benefit without payment of the value of the benefit." *Teton Peaks Inv. Co., LLC v. Ohme*, 146 Idaho 394, 398, 195 P.3d 1207, 1211 (2008). Because this is an equitable claim, we note: "The maxim, 'He who comes into equity must come with clean hands,' imposes itself alike upon him

10

who defends, and upon him who prosecutes, a suit in equity." *Witthoft v. Commercial Dev. & Inv. Co.*, 46 Idaho 313, 324, 268 P. 31, 34 (1928).

The district court concluded that each unjust enrichment claim failed. On appeal, Harris does not expressly dispute the trial court's rulings that none of the defendants was unjustly enriched. But Harris does argue that its alleged damages may support unjust enrichment claims.

### 1. Harris failed to prove that Johnson was unjustly enriched.

Three times, Harris sent checks to Johnson for work on the Fremont Project. The first was in June 2002, just before Harris and Johnson had a written agreement. That time, Harris sent Johnson a check for $7,467.44, which Johnson deposited. Johnson then paid Foxhollow the full amount of the check. Then, in August 2002, Harris sent Johnson a check for $21,904.00, which Johnson deposited. Again, Johnson paid Foxhollow the full amount of the check. Finally, in December 2002, Harris sent Johnson a check for $8,000.00.[7] Johnson returned this check with a letter from Johnson's lawyer disavowing any contract with Harris. "It was undisputed that Johnson never had 'so much as a shovel' on the Fremont Project construction site." The court found that Foxhollow defaulted before it was time for Johnson to perform its paving work so Johnson's paving "never came to fruition." But the court also found the checks Harris sent to Johnson were progress payments for Foxhollow's work on the Fremont Project. So the court concluded that Harris failed to prove that Foxhollow received an unearned benefit in the progress payments from Harris. The court also determined that Harris did not confer any direct benefit on Johnson.

There is no real dispute as to the trial court's factual findings on Harris' claim for unjust enrichment. Harris just disagrees with the court's conclusions. Harris argues that it made the progress payments in reliance on Egan's misrepresentations that all outstanding invoices from materialmen for project equipment had been paid. Harris contends that payments to Foxhollow via Johnson were not validly earned because of Egan's representations. According to Harris, Foxhollow did not validly earn the progress payments it accepted because there were outstanding invoices when Harris made the progress payments. Harris therefore reasons that even though Johnson forwarded the payments to Foxhollow, Johnson still received some unearned benefit

---

[7] As noted above, that check was also made out to L&M Landleveling. It is unclear from the record who L&M is.

11

when it deposited the progress payments in Johnson's account. Harris also contends that Foxhollow was an agent of Johnson, at least for part of the Harris-Johnson-Foxhollow agreement, and therefore a benefit conferred on Foxhollow was a benefit conferred on Johnson. Johnson's only rebuttal is to again echo the trial court, noting that Johnson retained none of the progress payment money.

Harris has not shown that it conferred any benefit on Johnson, much less a benefit that equity should reappropriate. As discussed above, the Harris-Johnson-Foxhollow arrangement was convoluted and most likely illegal.[8] Johnson apparently forwarded all progress payments to Foxhollow, except the last one, which Johnson returned to Harris. Thus, Harris' progress payments were a benefit conferred on Foxhollow, not Johnson. Harris has failed to prove that Johnson received any ancillary benefit from Foxhollow's progress payments. And even if Johnson benefited in some insignificant way, Harris was complicit in the Johnson-Foxhollow ruse. Harris therefore will not be heard to complain of unjust results flowing from the agreement. The district court did not err in concluding that Harris failed to prove that Johnson was unjustly enriched.

### 2.      Harris failed to prove Egan was unjustly enriched.

Egan was Foxhollow's on-site manager for the Fremont Project. Harris paid Egan's salary for the Fremont Project directly because Harris was concerned about Foxhollow managing its own cash flows. Between November 2001 and March 2002, Harris issued checks directly to Foxhollow for work on the Jefferson Project. Between May and December 2002, Harris issued checks to Foxhollow for work on the Fremont Project—some of these payments were made via Johnson and some were made jointly to materialmen. In September 2002, both Pro-Rentals and Western States contacted Scott regarding outstanding invoices for the Jefferson and Fremont Projects. In 2003, Pro-Rentals obtained a $4,757.90 judgment against Harris, Foxhollow, and Egan for unpaid invoices from the Fremont Project and for another $3,023.11 from the Jefferson Project.[9] The district court held that Harris did not prove that it conferred a benefit upon Egan because all payments Harris made to Egan were made on behalf of Foxhollow. Further, the

---

[8] *See supra* note 2.

[9] It is unclear from the record which party paid the judgment.

12

district court determined that any damages Harris paid to Pro-Rentals or Western States for rental equipment did not support an unjust enrichment claim against Egan because Egan himself did not benefit from using the equipment.

Again, Harris apparently does not take issue with the district court's findings of fact. Rather, Harris argues that it made progress payments to Foxhollow based on Egan's representations that all materialmen had been paid. According to Harris, once it learned of the outstanding invoices, it was too late to make Foxhollow pay. Harris also asserts that it spent a great deal of money on the Pro-Rentals litigation that resulted from the unpaid rental invoices. Harris argues that this supports an unjust enrichment claim. Egan appeared *pro se* and did not file a response.

All of Harris' payments to Egan were on behalf of Foxhollow. This arrangement was for accounting purposes. Harris simply paid Egan's wages that he earned as a Foxhollow employee. Egan would have recognized the same benefit if Harris had paid Foxhollow the entire contract amount and Foxhollow had paid Egan's wages. Thus, none of Harris' payments to Egan conferred a benefit on Egan. Second, Egan did not personally benefit from using the rental equipment on the Jefferson and Fremont Projects. Egan used the equipment as a Foxhollow employee, so any benefit of the equipment went to Johnson or Foxhollow under their subcontracts. Thus, even if Harris spent money in the Pro-Rentals litigation because Egan withheld invoices, that expenditure did not benefit Egan, nor did the underlying equipment rental. Accordingly, Harris has not shown that it conferred a benefit on Egan sufficient to support its unjust enrichment claim. The district court therefore did not err when it concluded that Harris' unjust enrichment claim against Egan fails.

### 3.     Harris failed to prove Kym Ferguson was unjustly enriched.

Kym Ferguson was an employee and shareholder in Foxhollow when Foxhollow was working on the Jefferson and Fremont Projects. Kym resigned from Foxhollow in late September 2002, around the time of Foxhollow's default on the Fremont Project. Kym then worked on the Fremont Project under an agreement between Harris and Ferguson Farms. Harris ultimately paid Ferguson Farms for its work in a settlement agreement after threats of litigation. The district court found that Harris premised its unjust enrichment claim against Kym "solely upon Foxhollow's alleged failure to submit the Pro-Rentals and Western States invoices . . . in a timely manner," and because of "the settlement money Harris, Inc. paid to Ferguson Farms." As with Egan, the court

13

held that Kym was not unjustly enriched because Harris did not confer a benefit on Kym, personally. The court also concluded that Harris "failed to sustain its burden to pierce the corporate veil of Foxhollow and attribute [Foxhollow's] debts to Kym Ferguson personally."

Once again, Harris apparently does not dispute the trial court's findings, but does argue that the unpaid equipment supplier invoices, the Pro-Rental litigation, and the settlement with Ferguson Farms resulted in expenses that support its unjust enrichment claim. Harris fails to explain exactly how any of those expenses amounts to a benefit conferred upon Kym. In response, Kym adopts Johnson's general argument that Harris failed to prove any damages and focuses his own argument on rebutting Harris' fraud claim.

Harris did not convince the district court it conferred a benefit upon Kym, and has not given this Court reason to disagree. Kym was an owner and employee of Foxhollow, but Harris never paid Kym directly. Harris has not shown that Kym was personally responsible for the unpaid equipment supplier invoices. And, as the district court determined, Harris has presented no grounds for holding Kym personally liable for Foxhollow's contracts. Moreover, Harris has not explained how the settlement with Ferguson Farms amounts to unjust enrichment. In short, Harris did not prove facts that support its unjust enrichment claim against Kym. The district court, therefore, correctly held that Kym was not unjustly enriched.

### D. The district court did not err in concluding that no defendant is liable for fraud.

Harris originally alleged claims of fraud against each of the defendants. "A party must establish nine elements to prove fraud: 1) a statement or a representation of fact; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of its falsity; 5) the speaker's intent that there be reliance; 6) the hearer's ignorance of the falsity of the statement; 7) reliance by the hearer; 8) justifiable reliance; and 9) resultant injury." *Glaze v. Deffenbaugh*, 144 Idaho 829, 833, 172 P.3d 1104, 1108 (2007) (internal quotation marks omitted).

The district court found that Harris premised its fraud claims against Johnson, Egan, and the Fergusons on representations by Egan or Melvin Voss, a Foxhollow employee, that all equipment suppliers had been paid. Harris also based its fraud claims against Johnson and the Fergusons on representations from Foxhollow's lawyer that all equipment suppliers had been paid and that Foxhollow was not in default on the Fremont Project. Egan was Voss's supervisor, an

14

employee of Foxhollow, and Johnson's agent on the Fremont Project. The court found that because of Egan's various roles on the Fremont Project, he was responsible for relaying supplier and equipment invoices to Harris.

Harris received letters from Western States and Pro-Rentals in mid-September 2002, notifying Harris of outstanding invoices. Egan had apparently negotiated the Western States equipment rental for use on the Fremont Project. The district court found that Harris put on no evidence to show whether the Western States equipment was used in the Johnson contract, the Foxhollow contract, or both. The Pro-Rentals invoices were for both the Fremont and Jefferson Projects, but the court found no indication as to whether the Pro-Rentals equipment was used under the Johnson contract, the Foxhollow contract, or both. Harris paid Johnson for Johnson's work on the Jefferson Project over a year before Foxhollow rented the unpaid-for Pro-Rentals equipment. Harris did, however, make two progress payments to Johnson in June and August, just before receiving notice of the unpaid invoices.

### 1.    Harris failed to prove Johnson was liable for fraud.

The district court held that Harris' fraud claim against Johnson failed for lack of proof of causation and because Harris knew or should have known that any assurances were false. The court determined that Egan and Voss either failed to alert Harris about the unpaid equipment suppliers, or that they gave inaccurate assurances that the suppliers had been paid. The court concluded that Egan or Voss knew or should have known that their silence or misrepresentations amounted to false assurances, upon which Harris would rely. According to the court, Harris had no notice of the unpaid invoices until it received the letters from Pro-Rentals and Western States, so Harris justifiably relied on Egan's or Voss's silence or assurances and suffered damage by issuing the June and August progress payments. But the court ultimately found that because the equipment at issue could have been involved with either the Johnson contract or the Foxhollow contract, or both, there was insufficient evidence to hold Johnson liable.

With regard to Foxhollow's lawyer's letter indicating that all equipment suppliers had been paid, the court concluded that the letter was a misrepresentation intended to induce Harris' reliance. But the court held that Harris was already on notice of the unpaid invoices when it received the letter and therefore could not reasonably rely on it.

15

On appeal, Harris argues that any distinction between Foxhollow and Johnson is immaterial. Harris points out that Foxhollow worked on the Fremont Project on behalf of Johnson and that Egan acted as Johnson's agent when it signed Johnson's contract with Harris, both of which were facts the district court found. Harris thus maintains that the court also should have found that Foxhollow was Johnson's agent, "especially since the entirety of Foxhollow's work was done under Johnson's public works license." Harris' argument implies that because there is no distinction between Johnson and Foxhollow, it makes no difference to whom the unpaid invoices are attributed. So Harris apparently contends it is entitled to recover simply because it relied on Egan's or Voss's representations, or lack thereof, that equipment suppliers were paid. It is unclear whether Harris disputes the district court's holding that Harris could not, and did not, reasonably rely on the letter from Foxhollow's lawyers.

Johnson does not directly refute any of Harris' arguments about the fraud claim. Johnson only contends that Harris failed to prove damages and so cannot support any of its claims.

The facts indicate that all the requirements for fraud were met. But the facts do not establish that Johnson is liable. As the district court concluded, Egan or Voss made false, material representations—or remained silent—regarding unpaid equipment suppliers. Egan or Voss made the representations with the intent that Harris make additional progress payments. Harris reasonably relied on the representations and made payments, but could have withheld payment if it knew of Egan's or Voss's misrepresentations. Yet, because there is no proof that the unpaid invoices were attributable to Johnson's contract, it has not been established that Egan's or Voss's misrepresentations were made on behalf of Johnson. Harris' contention—that Johnson is liable because Foxhollow operated under Johnson's public works license—is misleading and misstates the facts.[10] Harris contracted with both Johnson and Foxhollow. And

---

[10] Harris made the same argument in the district court in a motion to amend the findings and conclusions. That court also found the argument "disingenuous." In denying Harris' motion, the court observed:

> What became apparent to the Court . . . was that Harris, Inc.'s, Johnson's and Foxhollow's agreement to subvert the requirement of a public works license to their mutual benefit. When Foxhollow defaulted, due to apparent underbidding and a rainy spring season, Harris, Inc. sought to look to the firm with a stable financial base for recompense: Johnson. Johnson, on the other hand, attempted to disavow any knowledge of the subcontract altogether.

> For these reasons, this Court finds that Harris, Inc. cannot use an illegal ruse to squeeze damages from one of the co-conspirators.

16

even if Foxhollow performed some of Johnson's work, it is unclear that the unpaid invoices can be attributed to Johnson. Harris never proved the division of work between Johnson and Foxhollow. Egan and Voss could have been operating under the Johnson contract or the Foxhollow contract when they made the representations. Harris cannot pin the fraud on Johnson just because Foxhollow is insolvent. Thus, despite Egan's or Voss's apparent misrepresentations, the district court did not err in holding that Johnson was not liable for fraud.

### 2. Harris failed to prove Egan is liable for fraud.

The district court concluded that Harris' fraud claim against Egan failed because Harris did not rely on Egan's representations in its dealings with him. Harris continued paying Egan and Voss, even after Harris got notice of the unpaid invoices. The district court found that Harris "paid Egan $392.50 for reasons unknown, $503.73 for twenty (20) hours of work, and $230.22 for reasons unknown," four days after receiving such notice from Pro-Rentals, and two days after notice from Western States. It also found, Harris "paid Voss $469.43 for thirty (30) hours of work" for the Fremont Project on the same day—after receiving notice of the unpaid invoices. The court thus concluded that Harris continued paying Foxhollow's payroll after it got notice of the unpaid invoices. Accordingly, the court determined that with respect to its dealings with Egan, Harris did not rely on any misrepresentations because it continued paying Egan. So, the court held that Egan was not personally liable for any damages for fraud.

Indeed, Harris did get notice of the unpaid invoices several days before issuing Egan a number of checks. So, as the district court found, despite learning of Egan's alleged fraud, Harris continued paying Egan. Obviously, then, Harris was not relying on Egan's alleged misrepresentations at that time. Harris may have reasonably relied on Egan's representations before getting notice from Pro-Rentals and Western States, as it did in issuing the June and August progress payments. But once Harris learned of the outstanding invoices, any claimed reliance on Egan's representations would have been unreasonable. Therefore, the district court did not err in concluding that Harris had failed to establish its fraud claim against Egan.

### 3. Harris failed to prove the Fergusons were liable for fraud.

The district court had previously granted summary judgment on all claims against Ferguson Farms and Mike Ferguson. The court thus considered the fraud claim against the Fergusons only as to Kym Ferguson. The court determined that Foxhollow might be liable for fraudulent

misrepresentations. Nonetheless, the court held that Harris did not rely on Foxhollow's representations regarding unpaid invoices, because Harris paid Foxhollow's payroll after learning of the alleged fraud.

The court also held that Harris' fraud claim against Kym failed because Kym, as a director and shareholder in Foxhollow, was protected by Foxhollow's corporate limited liability. The court pointed out that Kym could be liable if he personally participated in the alleged fraud, but concluded he did not. At trial, there was some evidence that Kym told Tony Robles, a Harris employee, that Foxhollow planned to withhold all equipment supplier invoices until the Fremont Project was complete. The court concluded that even if Kym made such a statement, it did not constitute fraud because "it was a straightforward comment upon which Harris, Inc. was at liberty to act." In other words, even if Kym made that statement, it did not qualify as a fraudulent misrepresentation.

Harris now argues that Kym's alleged conversation with Robles happened after Harris incurred damages in reliance on Foxhollow's alleged misrepresentations. This, according to Harris, establishes that Kym acquiesced in Foxhollow's corporate wrongdoing and is therefore personally liable. Harris argues that the court erred because it did not definitively find that the conversation between Kym and Robles occurred. Kym responds by reiterating the district court's conclusions.

We are again unpersuaded to set aside the district court's decision. The district court was not convinced that Kym's alleged statements to Robles even took place. Harris asks this Court to revisit the district court's findings. Yet, the district court's findings are not clearly erroneous and therefore will not be set aside. And assuming, as the district court did, that Kym's alleged conversation with Robles occurred, the district court was correct that it does not amount to fraud. If Kym made the statement, it was not a misrepresentation. Rather, it was a comment on a matter that Harris was free to take up with Foxhollow or ignore. Harris has also failed to explain how Kym acquiesced in Foxhollow's alleged fraud. Moreover, Harris has failed to prove Foxhollow is liable for fraud at all. Harris continued paying Foxhollow after learning of the alleged fraud. Thus, as with the claim against Egan, Harris' fraud claim against Foxhollow would likely have failed because it does not appear that Harris reasonably relied on Foxhollow's

18

alleged misrepresentations. So, the district court did not err in holding that Harris' fraud claim against Kym fails.

E.    **The district court did not err in concluding that Harris is not entitled to indemnity from Johnson.**

Harris argued at trial that it was entitled to indemnification from Johnson and Foxhollow based on a clause in a document called "General Conditions to Contract." The district court concluded that the "General Conditions to Contract" was not part of the agreement between Harris and Johnson. The court found that Harris submitted in evidence a document entitled "General Conditions to Contract," which was dated three months after Egan, on Johnson's behalf, signed the contract with Harris. The court also noted that the October 9, 2002 date on the document post-dated the initial communications between the parties about Johnson's default on the Fremont Project. Furthermore, the "General Conditions to Contract" was not signed by either party. The court, relying on the law of contract formation, determined the "record does not contain sufficient evidence to show a meeting of the minds of Johnson and Harris, Inc. with regard to the General Conditions of Contract." The court therefore held that the additional terms were not part of the agreement between Johnson and Harris, so Harris was not entitled to indemnity under the additional terms.

In this Court, Harris contends that the "General Conditions of Contract" document was admitted in evidence without objection and therefore cannot be disregarded. Harris maintains that trial testimony proved that the document existed as of 2002 and a copy was attached to each contract Harris made in 2002. Harris also argues that the district court made findings consistent with duties outlined in the General Conditions document so therefore must have considered it part of the contract. In response, Johnson cites the district court's finding that the General Conditions document post-dated the signed agreement by three months. Johnson also contends that the district court correctly discounted the General Conditions exhibit but, interestingly, Johnson argues it was because the document was not an original, as required by the Best Evidence Rule.

The district court reached the right result for the wrong reasons. A signed agreement may incorporate by reference to another agreement, which is not signed by the parties, if the terms to be incorporated are adequately identified and readily available for inspection by the parties. *Wattenbarger v. A.G. Edwards & Sons, Inc.*, 150 Idaho 308, 320, 246 P.3d 961, 973 (2010). Here,

19

the district court found that the "General Conditions of Contract" post-dated the original agreement by three months. There is no evidence that the General Conditions were available to Johnson when Egan signed the agreement. Testimony that Harris used the General Conditions throughout 2002 is insufficient to prove that Johnson actually had access to the additional terms. Thus, the "General Conditions of Contract" was not established to have become a part of the agreement between Harris and Johnson. Harris cannot, therefore, maintain an indemnity claim founded on those Conditions. Accordingly, the district court did not err in holding that Harris' indemnity claim fails.

**F.      The district court did not abuse its discretion by denying Harris' Motion to Amend Findings and Conclusions.**

After trial, Harris filed with the district court a Motion to Amend Findings and Conclusions, and to Make Additional Findings and Conclusions. As a result, the court made a "single clarification" to its original findings, which it published in its First Amended Findings of Fact and Conclusions of Law. Otherwise, the court denied the motion, but only after considering Harris' brief in support of the motion and responses in opposition.

Harris contends that the district court erred when it denied Harris' Motion to Amend. Harris argues that there was ample evidence for the district court to make additional findings, which Harris maintains would have been beneficial to its case. In response, Johnson only opines that the district court did not err in its original findings and conclusions. The Fergusons' response simply adopts by reference Johnson's "argument."

"This Court reviews a denial of a motion to alter or amend under an abuse of discretion standard." *Reed v. Reed*, 137 Idaho 53, 61, 44 P.3d 1108, 1116 (2002). Here, Harris has not demonstrated that the district court abused its discretion in denying the motion. The court considered Harris' arguments, as well as opposition arguments, at length in a written opinion. Harris' assertion that the court could have made additional findings is unavailing. Thus, the district court did not err in denying Harris' motion to amend.

**G.      The district court abused its discretion by awarding fees and costs to Johnson and by awarding fees to the Fergusons.**

The district court concluded that Johnson and the Fergusons were each entitled to some fees and costs because Harris' action was based on a commercial transaction and because each was a prevailing party. I.C. § 12-120(3) provides for reasonable attorney fees in any action to recover on a contract for services or in any commercial transaction. A commercial transaction is any

20

transaction made for other than personal or household purposes. I.C. § 12-120(3). In order to recover fees under the commercial transaction prong of I.C. § 12-120(3), one party must allege that a commercial transaction occurred or a commercial transaction must be the actual basis of the lawsuit. *Garner v. Povey*, 2011 WL 3332258, at \*6–\*7 (Idaho Aug. 4, 2011). Whether an action is based on a commercial transaction is a question of law over which this Court exercises free review. *Id.* at \*6. When the transaction at issue in a lawsuit is an *illegal* commercial transaction, however, no party to the transaction is entitled to fees under I.C. § 12-120(3). *Trees v. Kersey*, 138 Idaho 3, 12, 56 P.3d 765, 774 (2002). "[C]osts shall be allowed as a matter or right to the prevailing party or parties, unless otherwise ordered by the court." I.R.C.P. 54(d)(1)(C).

Here, Johnson cannot claim the benefit of I.C. § 12-120(3). The record is replete with evidence that Harris, Johnson, and Foxhollow structured their agreement to circumvent Idaho's public works license requirement.[11] The district court found that Johnson's public works license was good for contracts up to $500,000.00. The court also determined, based on signed agreements, that the value of Johnson and Foxhollow's combined subcontracts—which Johnson bid for, and which were supposed to be "covered by" Johnson's license—was $655,068.00. Johnson thus agreed to oversee public works construction valued at 31% more than its license limitation. Moreover, Johnson intended for Foxhollow to perform much of Johnson's contracted-for work. The district court focused on Harris' knowing subversion of the public works licensure requirement, but the record—and the court's findings—equally show Johnson's flagrant disregard of the law. Assuming there was a commercial transaction between Harris and Johnson, it smacks of illegality. Johnson cannot claim ignorance or point the finger at Harris for the problematic arrangement; Johnson was, as the district court said, a "co-conspirator" in the "illegal ruse," and therefore cannot recover fees. Furthermore, even if Johnson prevailed in its defense, its flouting of the law impels us to disallow costs. We therefore hold that the district court abused its discretion in awarding fees and costs to Johnson.

The Fergusons are not entitled to fees, either. At oral argument, when asked to identify the commercial transaction between the Fergusons and Harris, counsel for the Fergusons said, "There was no commercial transaction between Ferguson [sic] and Harris." Because there was no

---

[11] *See supra* note 2.

commercial transaction between those two parties, the Fergusons cannot rely on the commercial transaction prong of I.C. § 12-120(3) to claim fees. *See Soignier v. Fletcher*, 151 Idaho 322, 327, 256 P.3d 730, 735 (2011) (fees are available under the commercial transaction prong of I.C. § 12-120(3) "so long as a commercial transaction occurred between the prevailing party and the party from whom that party seeks fees.") Accordingly, we hold that the district court abused its discretion in awarding fees to the Fergusons. But, because the Fergusons were successful in their defense, we do not disturb the district court's decision to allow costs.

## H. The district court did not abuse its discretion when it denied Harris' Motion for a New Trial.

Harris argues that the district court erred in denying its Motion for a New Trial. When it denied Harris' motion, the district court released an accompanying opinion. In that opinion, the court referenced the considerable amount of time this lawsuit has taken. The court also acknowledged the extensive discovery the parties undertook and the opportunity all parties had to organize their evidence and present their case. The court further pointed out the dearth of new, important evidence that Harris proffered.

"This Court has been consistent in recognizing the district court's important function in passing on motions for new trial, and upholding the district court's grant or denial of such a motion, unless the district court has manifestly abused the wide discretion vested in it." *Phillips v. Erhart*, 151 Idaho 100, 109, 254 P.3d 1, 10 (2011) (internal quotation marks omitted). Here, the district court considered Harris' motion and denied it for good reason. It therefore did not abuse its discretion.

## I. Neither Johnson nor the Fergusons are entitled to attorney fees on appeal.

Johnson and the Fergusons both request fees on appeal under I.C. § 12-120(3). For the same reasons discussed in Part II.G above, neither party is entitled to fees.

## III.
## CONCLUSION

We affirm the judgment of the district court, except that we vacate the award of fees and costs to Johnson, and the award of fees to the Fergusons. No costs or fees to any party on appeal.


Chief Justice BURDICK, and Justices EISMANN, W. JONES and HORTON CONCUR.