# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 39006

THE CITY OF MERIDIAN, an Idaho
municipal corporation,

    Plaintiff-Counterdefendant-Appellant,

v.

PETRA INCORPORATED, an Idaho
corporation,

    Defendant-Counterclaimant-
    Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, February 2013 Term

2013 Opinion No. 43

Filed: April 1, 2013

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. The Honorable Ronald Wilper, District Judge.

The judgment of the district court is <u>affirmed</u>.

Trout Law, PLLC, Boise, for appellant. Kim J. Trout argued.

Cosho Humphrey, LLP, Boise, and Holland & Hart, LLP, Boise, for respondent. Thomas G. Walker argued.

———————————

J. JONES, Justice.

    This appeal stems from a protracted contract dispute arising out of the construction of Meridian's new City Hall. The City of Meridian brought suit against the project's construction manager, Petra, Inc., alleging that Petra breached the parties' agreement in numerous ways. The City further claimed that Petra was not entitled to any additional fees for its work. Petra counterclaimed, seeking an equitable adjustment of its construction manager fee. After trial, the district court entered its findings of fact and conclusions of law, ruling against the City on all but one of its claims and awarding Petra an additional fee for its services. The court awarded Petra $595,896.17 in costs and $1,275,416.50 in attorney fees, but stayed enforcement of the judgment pending appeal. The City timely appealed. We affirm the judgment.

1

# I.
## FACTUAL AND PROCEDURAL HISTORY

In 2006, the City of Meridian was experiencing a surge in growth. Consequently, its Mayor and City Council (collectively, "the City") decided to construct a new City Hall. The City's initial plan was to build approximately 80,000 sq. ft. of Class A office space, related improvements, and parking (the Project). The City selected LCA Architects, P.A. (the Architect) to design the Project, and Petra as its construction manager.

The primary contract between Petra and the City was the Construction Management Agreement (CMA), which was drafted by the City. The CMA provided that the maximum budget for the Project would be $12.2 million. Additionally, the CMA incorporated several documents by reference: the Professional Services Agreement between the City and the Architect, as well as the AIA 201/CMa–1992 General Conditions (the A201), and the AIA 101/CMa–1992 (the A101). The CMA required Petra to purchase an errors and omissions liability insurance policy, which it did, and gave it the option of providing a payment and performance bond, which it did not. Petra and the City executed their agreement effective August 1, 2006.

The CMA addressed Petra's compensation as follows: the City agreed to pay Petra a flat construction management fee of $574,000, and to pay Petra's reimbursable expenses. The latter were Petra's "direct personal expense[s]" of certain professional staff; e.g., the Project Manager, the Project Engineer, and so on. Furthermore, the City agreed to pay Petra's reimbursable expenses for "General Conditions"—those items designated for procurement by Petra.

The CMA provided that changes in Petra's services could be accomplished upon the City's request, or if Petra's services were affected by "[s]ignificant change to the Project, including, but not limited to size, quality, complexity, owner's schedule, budget or procurement method." In either event, Petra would be entitled to an equitable adjustment of its construction manager fee and/or its reimbursable expenses, if the change(s) materially affected its services. Petra was to notify the City of any change in its services prior to providing them and to receive the City's approval for the change. Petra would not be entitled to an equitable adjustment for any change due to its fault.

Preconstruction of the City Hall began on July, 5, 2006, and construction subsequently started on May 7, 2007. The prime contractors who performed the construction services contracted with the City directly, and Petra agreed that it would observe each contractor's work, on site, at

2

least once a day, and report back to the City. Petra agreed to reject the work of any contractor whose work did not conform to the contract documents. That said, Petra did not guarantee the work of the contractors and was not responsible for their failure to carry out the work. Instead, each contractor was to give the City a warranty.

The City was initially scheduled to take occupancy of the building on August 1, 2008, but discovery of contaminated soil in February 2007 impacted the Project schedule early on. Accordingly, on May 22, 2007, Petra issued an updated schedule that reflected delays due to cleanup, and that moved the occupancy date to August 27, 2008. As noted by the district court, the Project "increased in size, scope, quality, and complexity after the agreement was executed." A variety of changes, directed by the City, were performed by Petra. These included:

> [I]ncreased size; the addition of a basement to effectively contend with an unanticipated ground water issue; upgraded offices and council chambers from those contemplated in the parties' original agreement; re-design of the Mayor's office suite; better than standard exterior stone and brick; high tech mechanical and electrical systems; and an upgraded public plaza and amphitheater.

As the Project continued to evolve in complexity and scope, the CMA required Petra to update the Construction Management Plan, and submit it to the City for approval. On January 29, 2008, Petra presented another updated schedule, which now pegged the occupancy date at October 10, 2008. During this phase, the budget of the Project also greatly expanded, from the initial budget of $12.2 million, to more than $15 million in 2007, and more than $20 million in 2008. The City was aware of the costs and approved them.

Several companies and individuals performed required testing, observation, and inspection during the course of construction. These included Petra, the Architect, the engineers, a commissioning agent hired by the City, and the City's building inspectors. With a few identified exceptions, all systems passed inspection, or were corrected after not initially passing. When one contractor caused a delay in the Project, Petra recommended that the City assess liquidated damages against it, which the City did.

As construction reached a close, Petra and the Architect jointly developed "punch lists"— lists that detailed remaining problems with the Project that needed to be corrected. The parties dispute this point, but it seems that the items on these lists were either corrected, or were covered by the various contractors' warranties. At this point, the Architect was required to issue certificates stating that the work was substantially complete. Petra asked the Architect to do so, but it did not.

3

The City took occupancy of the new building on October 15, 2008, which was the same date the contractors' warranties became effective. The final cost of the Project was $21,395,962.13.

The catalyst of this litigation was Petra's request for an equitable adjustment to its construction manager fee and reimbursable expenses. In 2007, Petra corresponded with the City's purchasing agent and discussed an equitable adjustment based on the extra services it was providing as the Project evolved. The City and Petra agreed that Petra would wait until the final base contract value of the Project was determined before submitting a fee request. Later that year, Petra reminded the City of this issue by sending notice of its intention to seek an equitable adjustment.

In April of 2008, Petra provided the City with a formal "change order" that requested an equitable adjustment for 4.7% of the cost of the Project in excess of $12.2 million, which, at that point, amounted to $367,808. The City requested more information to justify the request, which Petra provided on August 3, 2008. However, the City denied the request on February, 24, 2009. The parties attempted to resolve their disputes through mediation, but were unsuccessful.

The City filed this lawsuit against Petra on April 16, 2009, seeking a declaratory judgment that Petra was not entitled to an increased fee. The City also sought damages from Petra for breach of contract. The City eventually alleged numerous instances of deficient work or damage for which it claimed Petra was responsible, including roof damage, subpar masonry work, an improperly balanced HVAC system, and a leaky water feature. Petra counterclaimed, alleging breach of contract and seeking the amount of its equitable adjustment.

During the pre-trial phase, myriad motions were filed by both parties. This included the City's motion for summary judgment, asking the district court to find that the Idaho Tort Claims Act (ITCA) barred Petra's counterclaim. The court denied the motion. The City also moved to amend its Complaint, which the district court denied.

This case was tried by the court, sitting without a jury, from December 2, 2010, to April 7, 2011. The district court held that Petra properly managed the Project's contractors and that it did not breach the parties' agreement. Further, it held that Petra was entitled to an equitable adjustment for the additional services it provided the City as the Project grew in scope. The district court concluded that 4.7% was a proper metric for the equitable adjustment. Also, the court found that Petra had overcharged the City during the course of work, though it did not consider this a breach. It offset Petra's damages by $52,000, which resulted in an award of $324,808. The district court

4

found Petra to be the prevailing party and entitled to recover "pre-judgment interest, costs allowed under I.R.C.P. 54, and reasonable attorney fees incurred." Judgment to that effect was entered on June 14, 2011. The City timely appealed.

## II.
## ISSUES ON APPEAL

I.     Did the district court err in concluding that Petra is entitled to an equitable adjustment of its construction manager fee and contract reimbursable expenses?

II.    Was the district court's award of a percentage-based equitable adjustment proper?

III.   Did the district court err in not applying Section 8 of the CMA to dismiss Petra's counterclaims?

IV.   Does the Idaho Tort Claims Act bar Petra's counterclaim?

V.    Was Petra the City's fiduciary?

VI.   Did the district court err in concluding that Petra did not breach the CMA?

VII.  Did the district court correctly calculate the damages offset attributable to Petra's overcharge?

VIII. Did the district court err in allowing the testimony of Tim McGourty?

IX.   Did the district court err by disregarding damages evidence?

X.    Did the district court err in not allowing the City to amend its Complaint?

XI.   Did the district court err by awarding Petra attorney fees?

XII.  Is either party entitled to attorney fees on appeal?

## III.
## DISCUSSION

**A. The district court correctly concluded that Petra is entitled to an equitable adjustment of its construction manager fee and contract reimbursable expenses.**

1.   <u>Standard of Review</u>.

This Court limits its review of a trial court's decision to determining "whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law." *Shore v. Peterson*, 146 Idaho 903, 907, 204 P.3d 1114, 1118 (2009). Unless the trial court's findings of fact are clearly erroneous, they will not be set aside. *Id.* Accordingly, "even if the evidence is conflicting, if the findings of fact are supported by substantial and competent evidence [we] will not disturb those findings on appeal." *Id.* Conversely, when reviewing a trial court's conclusions of law, "this Court is not bound by the legal conclusions of the trial court, but may draw its own conclusions from the facts presented." *Id.*

When interpreting a contract, we start with the document's language. *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 148 Idaho 630, 633, 226 P.3d 1277, 1280 (2010). Further, "[i]n the

absence of ambiguity, the document must be construed in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument." *Id.* (quoting *C & G, Inc. v. Rule*, 135 Idaho 763, 765, 25 P.3d 76, 78 (2001)). Both interpreting an unambiguous contract and determining whether there has been a violation of that contract are "issue[s] of law subject to free review." *Id.*

    2.  <u>The Agreement Between Petra and the City</u>.

    In its Order, the district court determined that the parties' agreement consisted of three documents: 1) the CMA, which "forms the basis of the contract"; 2) the provisions of the A201; and, 3) the Professional Services Agreement between the Architect and the City. On appeal, the City contends that the "Contract Documents" are far more expansive, and that they include the CMA, the A101, the A201, the Professional Services Agreement, the Construction Management Plan, and the various City Hall specifications. Petra's response, on the other hand, contends that the CMA was the primary contract document, but that the parties' agreement include[ed] the general conditions set forth in [the A201]." The issue—crucial for evaluating the multitude of other issues in this litigation—is which documents made up the parties' agreement. We conclude that the CMA, A101, A201, and Professional Services Agreement comprised the parties' agreement.

    If a written contract is complete upon its face and unambiguous, and no party alleges any fraud or mistake, "extrinsic evidence of prior or contemporaneous negotiations or conversations is not admissible to contradict, vary, alter, add to, or detract from the terms of the contract." *Howard v. Perry*, 141 Idaho 139, 141, 106 P.3d 465, 467 (2005). If a written contract contains a merger clause, then it is complete upon its face. *Id.* at 142, 106 P.3d at 468. As explained in *Howard*:

> The purpose of a merger clause is to establish that the parties have agreed that the contract contains the parties' entire agreement. The merger clause is not merely a factor to consider in deciding whether the agreement is integrated; it proves the agreement is integrated. To hold otherwise would require the parties to list in the contract everything upon which they had not agreed and hope that such list covers every possible prior or contemporaneous agreement that could later be alleged.

*Id.* Despite this, "[a] signed agreement may incorporate by reference to another agreement, which is not signed by the parties, if the terms to be incorporated are adequately identified and readily available for inspection by the parties." *Harris, Inc. v. Foxhollow Const. & Trucking, Inc.*, 151 Idaho 761, 777, 264 P.3d 400, 416 (2011). Additional terms that post-date the original agreement are necessarily unavailable for inspection; thus, the original agreement cannot incorporate them by

reference. *Id.* (finding that "the 'General Conditions of Contract' post-dated the original agreement by three months" and, with no evidence that those terms were available to the parties, they were "not established to have become part of the agreement").

Here, it is clear and undisputed that the CMA is the basis of the parties' agreement—it was drafted by the City and executed by both parties in August of 2006. And, although the CMA has an integration clause and is thus clear on its face and integrated, it incorporates additional documents. First, it expressly incorporates the Professional Services Agreement between the Architect and Petra: "Construction Manager hereby acknowledges that it has received, reviewed, and studied the agreement form that Owner intends to use with Architect (the "Architectural Agreement"), and the same is herein incorporated by reference." The Professional Services Agreement was executed a month before the CMA, and nothing suggests that the parties did not have access to its terms, so it was properly incorporated into the original agreement.

The CMA then incorporates other documents:

> Construction Manager shall have and perform those duties, obligations and responsibilities set forth in the construction agreements between Owner and each Contractor (the "Construction Contracts"). Construction Manager hereby acknowledges that it has received, reviewed, and studied the forms that Owner intends to use for the Construction Contracts, and the same is herein incorporated by reference.

The parties and the district court concluded that this refers to the A101 and the A201. For one thing, the A101 was the contract entered into between the City and the various prime contractors. Further, witnesses with construction industry experience verified that "Construction Documents" referred to the two documents—the former being the agreements "between the [City] and the prime contractors or the trade contractors," and the latter being the "general conditions" for the Project. With respect to the availability of the A101 and the A201, these are standard American Institute of Architects forms and have been in service since 1992. Thus, the A101 and A201 existed at the time the CMA was executed and were presumably readily available for inspection. Accordingly, the A101 and A201 were properly incorporated into the CMA.

Despite the CMA's incorporation of these documents, the parties' agreement would not include the Construction Management Plan, or the City Hall specifications, as alleged by the City. *Harris* allows a signed agreement to incorporate other unsigned documents by reference. Here, however, the CMA does not expressly incorporate the Plan or any specifications. And, although

the CMA did allow for modifications, it provided that "[t]his Agreement may be modified only in writing signed by both parties." Neither the Construction Management Plan, nor any of the specifications, were signed by the parties. Thus, the Plan and specifications did not modify the agreement between the parties.

In sum, we hold that the parties were bound by four documents: the CMA, the Professional Services Agreement, the A101, and the A201.

3. <u>The Agreement's Requirements for Equitable Adjustments and Increased Reimbursables.</u>

Early in its Order, the district court made two findings regarding the proper procedure for requesting an equitable adjustment to Petra's fee:

18. The parties agreed that in the event Petra's services were materially affected by significant changes in the size, quality, complexity, schedule or budget of the project, Petra would be entitled to an equitable adjustment of [its] construction management fee and [its] reimbursable expenses.

19. Prior to providing additional management services based on project changes, Petra agreed to notify the City and receive the City's approval for the additional services.

Thereafter, the court concluded something notably different: that Petra was not required to seek approval for providing the additional services, but that the City had a "contractual right to pre-approve *the request for equitable adjustment*." (Emphasis added.) This distinction frames the City's appeal. The City agrees with the latter finding, and argues that the CMA gave the City the right to approve the budget, and not the services—in other words, that Petra had to provide notice "of an intention to seek an increased [construction management] fee before providing any additional services." Various arguments flow from this: that Petra never represented its fees would increase; that the City never approved any increased fees; that the CMA required the notice be delivered, in writing, to designated city officials; and that the district court incorrectly found the City waived, or was estopped to use, these various defenses.

In response, Petra argues that the CMA does not give the City the right to pre-approve any fee adjustments. It contends instead that the CMA "imposes a mandatory obligation on the City to pay an 'equitable adjustment' where the preconditions are satisfied."

The dispositive issue regarding the adjustment to Petra's fee is whether Petra was required to provide notice and receive approval for additional services, or whether it was required to notify

8

and receive approval for the increased fee. Based on the plain language of the CMA, it is evident that Petra was only required to notify and receive approval for additional services. Furthermore, substantial and competent evidence shows that the City was notified, and did so approve. Thus, we find the district court correctly concluded that Petra complied with the CMA notice requirements, and thus was entitled to an equitable adjustment of its fee and reimbursable expenses.

This Court has no "roving power to rewrite contracts in order to make them more equitable." *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 362, 93 P.3d 685, 693 (2004). Thus, when weighing various interpretations of contracts, we consider the language of the agreement as "the best indication of [the parties'] intent." *Straub v. Smith*, 145 Idaho 65, 69, 175 P.3d 754, 758 (2007). This Court further "construe[s] the contract against the person who prepared the contract." *Id.*

The language governing Petra's ability to seek an equitable adjustment can be found in the CMA. It states:

> Changes in Construction Manager's services (not involving a cardinal change to the scope of the services) may be accomplished after the execution of this Agreement upon Owner's request or if Construction Manager's services are affected by any of the following:
>> (a) A change in the instructions or approvals given by Owner that necessitate revisions to previously prepared documents or the reperformance of previously performed services;
>> (b) Significant changes to the Project, including, but not limited to size, quality, complexity, Owner's schedule, budget or procurement method;
>> . . . .
> Except as otherwise set forth in this Agreement, if any of the above circumstances materially affect Construction Manager's services, Construction Manager shall be entitled to an equitable adjustment in the Schedule of Performance, the Construction Manager's Fee and/or the not-to-exceed limits for reimbursable expenses, as mutually agreed by Owner and Construction Manager. Prior to providing any additional services, *Construction Manager shall notify Owner of the proposed change in services and receive Owner's approval for the change*. Except for a change due to the fault of the Construction Manager, a change shall entitle Construction Manager to an equitable adjustment in the Schedule of Performance, Construction Manager's Fee, and/or the not-to-exceed limits for reimbursable expense as mutually agreed by Owner and Construction Manager.

(Emphasis added.)

Given that this Court looks first to the language of a contract, the CMA's text resolves this issue. It states that Petra "shall notify Owner of the proposed change in services and receive

9

Owner's approval for the change." The City's position is that the CMA required Petra to "advise[] the City of its intention to seek an increased CM fee" before work began on the City Hall basement, which was not a part of the initial Project and subsequently requested by the City. However, this contention finds no support in the CMA. Per the agreement's plain language, Petra did not need to notify and receive approval for any increased fee, just for the "proposed change in services." Indeed, according to the agreement, where the change is made "upon Owner's request," it would be superfluous to require subsequent notification to, and approval by, the City. Where the City specifically requests a change, it is obvious that it approves of the change.

Additionally, the City's proposed interpretation—beyond being contrary to the CMA's text—leads to a result that is commercially backwards as well. Petra is required to do "all things necessary, appropriate or convenient to achieve the end result desired by the Owner." Thus, the City could ask Petra to build a basement, or provide any other additional services it would like, and Petra would be bound to comply. Yet, under the City's interpretation of the fee provision, it could then simply deny Petra's request for an additional fee, while enjoying the benefits conferred by Petra, absent a prior agreement to an increase in the fee. This adjustment scheme seems hardly equitable. *See generally Climax, LLC v. Snake River Oncology of E. Idaho, PLLC*, 149 Idaho 791, 796, 241 P.3d 964, 969 (2010) ("In its broadest and most general signification, equity denotes the spirit and habit of fairness, justness, and right dealing which would regulate the intercourse of men.") The CMA's text, as written, provides a much more sensible arrangement: Petra cannot, on its own, provide additional unrequested services and rack up its fees—it must notify and receive approval for all proposed changes. But once those additional services have been approved and provided, it is entitled to an equitable adjustment. Indeed, the contract specifically provides that "a change *shall entitle* Construction Manager to an equitable adjustment," except where the change is the fault of the Construction Manager. (Emphasis added).

The City argued at length in its briefing that Petra did not notify the City before requesting an increased fee. However, the City never contends that it had no notice of any change in services. Nor does the City argue that it did not approve of any of the changes Petra made. In fact, both parties' briefing, the district court's findings, and the record indicate that all changes made to the City Hall were done at the City's behest,[1] eliminating the need for notice and approval.

---

[1] The City conceded in its brief that "it must be said that the City approved identified increases to costs of construction" and Petra likewise argued that "[t]he City approved every contract, every change order, every

10

Accordingly, there was substantial and competent evidence that the CMA's change in services requirements were satisfied. Therefore, we affirm the district court's conclusion that Petra complied with the CMA, and is entitled to an equitable adjustment of its construction management fee and reimbursable expenses.

**B. The district court's award of a percentage-based equitable adjustment was proper.**

The other issue flowing from the district court's decision to award an equitable adjustment was whether it was proper for the adjustment to be percentage-based. The City argues that by awarding the equitable adjustment on a percentage basis, the district court "improperly used extrinsic evidence, rather than employ[ing] the contractually defined methodology for establishing specific increases." Specifically, it contends that an adjustment to reimbursables would have to adhere to Section 6.2.2 of the CMA, and reflect the hours spent providing the service, of which Petra did not keep track. The City further argues by analogy that "[w]hile there is no specific methodology" for calculating the increased construction management fee, if a fee adjustment is not similarly based on actual hours worked then it is arbitrary and inequitable. With respect to reimbursables, Petra argues that while Section 6.2.2 of the CMA requires proof of actual hours worked, Section 7, the specific provision regarding equitable adjustments, does not. Petra further contends that the 4.7% percentage-based adjustment is equitable, and not arbitrary, because that same ratio was used in determining the amount of the original construction management fee, as well as a subsequent change order. We agree and find that the district court's use of a percentage-based adjustment was proper.

The CMA states that, in the event of providing additional services, Petra is "entitled to an equitable adjustment [to its] Construction Manager's Fee and/or the not-to-exceed-limits for reimbursable expenses." However, it does not provide a method for calculating this adjustment—just that it would be "as mutually agreed by Owner and Construction Manager." By not specifying how adjustments will be made when the parties cannot agree—such as during litigation—the parties essentially left it to the district court to determine what the fee should be.

A 4.7% adjustment is equitable because it conforms with the parties' prior course of dealing. As noted by Petra, the original construction management fee, though stated in the CMA as a fixed amount, was 4.7% of the original Project budget. Furthermore, a subsequent change order

contractor payment, and thus, the total cost of the Project, with full knowledge of the relevant and material facts." Both of these conclusions were supported by the findings of the district court.

11

based on the contaminated soil removal expressly calculated the construction manager fee adjustment "at 4.7% of $422,000." The parties agreed on the use of the 4.7% fee for the change order. "The conduct of the parties to a contract and their practical interpretation of it is an important factor when there is a dispute over its meaning." *Mountainview Landowners Coop. Ass'n, Inc. v. Cool*, 142 Idaho 861, 865, 136 P.3d 332, 336 (2006). Because the parties used this percentage in prior dealings, it is reasonable, and equitable, to likewise use it as the factor for the equitable adjustment. Moreover, the proper time for haggling over the adjustment metric was during contract formation. As a sophisticated party, the City took a risk, *ex ante*, by not specifying how the adjustment would be calculated. It could have drafted its own preferred metric, but for whatever reason it did not. It thus cannot credibly argue now, *ex post*, that the adjustment chosen by the district court is unsuitable. In any event, the district court's percentage-based adjustment conforms with the parties' prior conduct and, thus, is proper. We therefore affirm.

## C. The district court correctly declined to apply Section 8 of the CMA to Petra's counterclaim.

The City argues on appeal that Section 8 of the CMA, which governs claims, should apply here and bar Petra's counterclaim. It contends that because Petra knew it had a "claim" for an equitable adjustment in January 2007, Petra should have given notice that complied with the procedures detailed in Section 8. The City avers that because Petra did not comply with Section 8's notice procedures, Petra is not entitled to an equitable adjustment. The district court did not consider this issue, but Petra argued in response that Section 7 is the specific provision addressing changes and fee adjustments. It therefore contends that the more general claims procedure outlined in Section 8 would not apply.

When contractual provisions conflict, "the interpretation of the written contract and of the intent of the parties is a matter for the trial judge's discretion." *Haener v. Ada Cnty. Highway Dist.*, 108 Idaho 170, 173, 697 P.2d 1184, 1187 (1985). Moreover, "[i]t is well established that specific provisions in a contract control over general provisions where both relate to the same thing." *Twin Lakes Vill. Prop. Ass'n, Inc. v. Crowley*, 124 Idaho 132, 138, 857 P.2d 611, 617 (1993).

Section 7 of the CMA provides the notice procedures for requesting an equitable adjustment, as discussed at length above. However, the CMA subsequently provides a procedure for making claims in the general sense:

In the event [of] any claim, dispute or other matter in question between Owner and

12

Construction Manager arising out of or related to this Agreement or the breach hereof (a "Claim"), Owner and Construction Manager shall first endeavor to resolve the Claim through direct discussion. Claims must be initiated by written notice. [] Construction Manager agrees that it shall submit a Claim to Owner by written notice no later than twenty-one (21) calendar days after the event or the first appearance of the circumstances giving rise to the Claim, and that such written notice shall set forth in detail all facts and circumstances supporting the claim.

Section 8.2 then states that the parties must mediate their "Claims" before resorting to litigation.

We hold that Section 7, not Section 8, governs Petra's request for an equitable adjustment. Although the district court did not consider the conflict between these two provisions, it was within its discretion to apply Section 7 instead of Section 8. Section 7 deals with equitable adjustments specifically, and Section 8 deals with claims generally. Because Petra's request was not some freestanding claim, but a request for an equitable adjustment, our longstanding rule of interpretation requires the application of the appropriate, adjustment-specific section. *Id*. More fundamentally, the sole point of Section 7 is to establish the method for requesting equitable adjustments. For Section 7's existence to matter, Section 8 must not override it. We therefore affirm the district court's application of Section 7 to Petra's request for an equitable adjustment. Accordingly, Section 8 does not bar Petra's counterclaim for an equitable adjustment to its fees.

### D. The Idaho Tort Claims Act does not bar Petra's counterclaim.

Prior to trial, the City moved for summary judgment, arguing that the Idaho Tort Claims Act (ITCA) bars Petra's claims. The district court ruled against the City and found that Petra's "cause of action didn't accrue fully until February 24, 2009," when its request for an equitable adjustment was denied by the City. The court therefore reasoned that Petra's subsequent request for mediation, given on March 16, 2009, was timely for the purposes of the ITCA. The district court therefore concluded that the ITCA would not bar Petra's counterclaim. The City disagrees on appeal, arguing that the notice period begins to run at the occurrence of the "wrongful act." It contends that the wrongful act was not the City's denial of the adjustment, but rather, the actual additional work that Petra provided months before. Petra agrees with the district court in its response and argues that because "a claimant discovers his claim . . . only when he becomes apprised of the injury," Petra was unaware it had a claim until its request was actually denied. It thus contends that its request for mediation was timely notice of its claim, and that the ITCA would not bar the claim.

13

Based on the text of the ITCA and Idaho precedent, we hold that the ITCA time limit began to run not when Petra performed additional services, but when the City denied its fee request. Petra's notice was therefore timely, and its counterclaim is not barred by the ITCA.

Idaho Code § 50-219 provides that "[a]ll claims for damages against a city must be filed as prescribed by [the ITCA]." The ITCA, in turn, states that:

> All claims against a political subdivision [subdivision] arising under the provisions of this act and all claims against an employee of a political subdivision for any act or omission of the employee within the course or scope of his employment shall be presented to and filed with the clerk or secretary of the political subdivision within one hundred eighty (180) days from the date the claim arose or reasonably should have been discovered, whichever is later.

I.C. § 6-906. Thus, parties seeking damages from a city must comply with the ITCA, which requires notice of the claim within 180 days "from the date the claim arose or reasonably should have been discovered." *Id.*

Idaho case law sheds some light on the precise meaning of when a claim "arises" for the purposes of the ITCA. In *Mitchell v. Bingham Memorial Hosp.*, 130 Idaho 420, 942 P.2d 544 (1997), we noted that "the statutory period begins to run from the occurrence of the wrongful act even if the full extent of damages is not known at that time." *Id.* at 423, 942 P.2d at 547. Moreover, "[t]he statute does not begin running when a person fully understands the mechanism of the injury and the government's role, but rather when he or she is aware of such facts that would cause a reasonably prudent person to inquire further into the circumstances surrounding the incident." *Id.* The *Mitchell* Court then applied this rule to a situation where a hospitalized patient suffered an overdose that was initially blamed on hospital equipment, but was actually caused by a nursing error. *Id.* We held that although there was initial confusion as to the source of the patient's overdose symptoms, the 180-day statutory period nonetheless began to run when the symptoms began—in other words, the running of the clock was not tolled simply because the plaintiff was misinformed as to the cause of her symptoms. *Id.* at 423–24, 942 P.2d at 547–48.

A subsequent case further clarifies the ITCA's statutory clock and contains facts strikingly similar to this case. *Magnuson Properties P'ship v. City of Coeur d'Alene*, 138 Idaho 166, 59 P.3d 971 (2002). In *Magnuson*, a developer engaged with the City of Coeur d'Alene for its approval of a plan to subdivide some undeveloped property. *Id.* at 168, 59 P.3d at 973. As a "condition of approval," the City required that Magnuson extend a sewer line at the partnership's own expense and allegedly induced it to do so with a promise to reimburse it. *Id.* After

14

performing the work, Magnuson requested reimbursement from the City. In response, the "City denied the existence of any agreement between" them and denied the request by a letter dated August 13, 1996. *Id.* Magnuson subsequently sued the City for damages, which led this Court to consider when the ITCA statutory period began to run. *Id.* at 168–70, 59 P.2d at 973–75. We concluded that:

> The record reflects that, at the very latest, Magnuson had knowledge of the City's August 13, 1996 letter on August 15, 1996, which places Magnuson's February 18, 1997 notice beyond the 180-day period. The City's letter denies the existence of any agreement between the City and Magnuson and rejects Magnuson's request for reimbursement. As of August 15, 1996, a reasonable and prudent person would have knowledge of facts of a wrongful act, i.e., the City's denial of and/or breach of the alleged contract. Therefore, the 180-day notice period began on August 15, 1996, and Magnuson failed to provide timely notice of its claim.

*Id.* at 170, 59 P.2d at 975.

Here, like in *Magnuson*, a developer requested payment from a city. Furthermore, the cities in both cases denied the fee request via letter. The *Magnuson* Court did not conclude that the statutory period began when Magnuson performed the work, or when it was told it would be reimbursed. Rather, we held that the letter of denial was the trigger. Thus, the City's contention that the statutory period began running when Petra performed the work is incorrect. The 180-day statutory period began running when the City denied Petra's fee request. And because Petra's request for mediation was within those 180 days, we hold that the ITCA does not bar Petra's claim.

### E. Petra was not the City's fiduciary.

Another issue raised below is whether Petra and the City had a fiduciary relationship. The district court concluded that the parties did not have a fiduciary relationship and, alternatively, if Petra did have a fiduciary duty, it fulfilled that duty. The City contends on appeal that the language of the CMA—particularly, its reference to the parties' mutual "trust and confidence"— created a fiduciary relationship. The City's contention, which it attempts to buttress with case law, is that "[t]he common use or settled meanings of the terms 'trust and confidence' are those used to describe a relationship [that] is fiduciary in nature." Petra responds that "mere respect for another's judgment or trust" does not create a fiduciary relationship. It further points out that had the parties intended to make Petra a fiduciary, they could have simply said so. Because our

15

State's precedent lends little support to the City's arguments here, we hold that Petra was not a fiduciary.

Establishing a claim for breach of fiduciary duty first requires a finding that a fiduciary relationship exists. *Beaudoin v. Davidson Trust Co.*, 151 Idaho 701, 705, 263 P.3d 755, 759 (2011). Whether a fiduciary relationship exists is a matter of law over which this Court exercises free review. *Id.* Generally speaking, where one party is "under a duty to act or to give advice for the benefit of the other upon a matter within the scope of the relation," a fiduciary relationship exists. *Id.*

These general rules have been fleshed out by Idaho case law. In *High Valley Concrete, L.L.C. v. Sargent*, 149 Idaho 423, 428, 234 P.3d 747, 752 (2010), this Court reiterated many of the prior decisions regarding this issue and, in doing so, noted that fiduciary relationships are "commonly characterized by one party placing property or authority in the hands of another, or being authorized to act on behalf of the other." We then elaborated:

> The term fiduciary implies that one party is in a superior position to the other and that such a position enables him to exercise influence over one who reposes special trust and confidence in him. . . . As a general rule, mere respect for another's judgment or trust in this character is usually not sufficient to establish such a relationship. *The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party.*

*Id.* (quoting *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 278, 824 P.2d 841, 853 (1991)). The *Sargent* Court then cautioned that a fiduciary relationship "does not exist when parties are dealing with one another at 'arm's length,'" stating, "Idaho law establishes that no fiduciary duty ordinarily arises between parties to an arm's length business transaction." *Id.* We concluded by favorably quoting a Court of Appeals decision that listed "examples of relationships from which the law will impose fiduciary obligations on the parties":

> [M]embers of the same family, partners, attorney and client, executor and beneficiary of an estate, principal and agent, insurer and insured, or close friends. All the evidence presented in this case shows that Mitchell and Barendregt shared none of these relationships, but were parties who entered into an agreement at arms [sic] length.

*Id.* (quoting *Mitchell v. Barendregt*, 120 Idaho 837, 844, 820 P.2d 707, 714 (Ct. App. 1991)).

16

With that framework in mind, an examination of the relationship between Petra and the City must begin with the agreement between the parties. And, despite the City's claims, the parties' agreement does not create a fiduciary relationship. In the CMA, the parties agreed that Petra "acknowledges and accepts the relationship of trust and confidence established with Owner by this Agreement and that this relationship is a material consideration for Owner entering into this Agreement." The City points to this "trust and confidence" phrase as the sole evidence of the duty. However, no Idaho cases hold that simply using those words will create such a relationship. Indeed, although the *Sargent* Court identified "trust and confidence" as being factors in the analysis, they were not the only factors. As we noted, a fiduciary relationship also depends on one party having a superior position, the other party reposing a "special trust," and most importantly, the trusting party believing—with good reason—that the other party is not acting in its own interests. Moreover, we cautioned in *Sargent* that "mere" respect for another party's judgment or trust in their character is typically not enough to create a fiduciary duty.

Here, the City has not shown that this agreement meets the criteria for creating a fiduciary duty. It does not claim that Petra was in a superior position, or that it reposed a "special" trust in the construction manager, beyond mere trust in its judgment. Nor does the City claim it had good reason to believe, let alone that it actually did believe, that Petra was acting in anyone but Petra's interests. Petra and the City were not relatives, partners, best friends, or any of the class of fiduciaries identified in *Sargent*. Indeed, the City has offered no evidence or argument that the deal between the two was anything but a business transaction, occurring at arm's length. And the single criterion proffered by the City in its argument—trust between the parties—was singled out by the *Sargent* Court as being generally insufficient to create a duty. We accordingly uphold the district court's conclusion that Petra was not the City's fiduciary.

**F. The district court erred in holding that Petra did not breach the parties' agreement, as both Petra's overcharging, and its failure to secure a performance bond, were breaches of the contract. However, these breaches were not material, and the City suffered no harm from the failure to secure a bond. The district court correctly concluded that no other breaches occurred.**

Beyond Petra's counterclaim for an equitable adjustment, the second major issue in this matter is the City's allegation that Petra breached the parties' agreement. The City alleged numerous breaches on appeal, ranging from overcharging and bonding issues to the scheduling of the Project, all of which are dealt with below. We conclude that: 1) Petra breached the parties'

17

agreement by overcharging the City and by failing to secure a payment and performance bond; 2) these two breaches were not material, and the bond-related breach caused no damages; 3) the district court correctly concluded that the City is entitled to an equitable reimbursement for the overcharges, as detailed in Section **G**, *infra*; and 4) the district court correctly concluded that the City's other allegations of breaches are without merit.

    1.   Standard of Review.

Our posture for reviewing a district court's findings with regard to alleged contract breaches is stated in *Borah v. McCandless*, 147 Idaho 73, 205 P.3d 1209 (2008):

> Generally, unless the facts presented are undisputed, whether there was a breach of the terms of a contract is a question of fact. . . . Whether such a breach is material is also a factual question.

*Id.* at 79, 205 P.3d at 1215 (citations omitted). Unless the district court's findings of fact are clearly erroneous, those findings will not be set aside. *Shore*, 146 Idaho at 907, 204 P.3d at 1118. Consequently, "even if the evidence is conflicting, if the findings of fact are supported by substantial and competent evidence this Court will not disturb those findings on appeal." *Id.*

    2.   Overcharging.

The district court found that "Petra charged [the City] for a number General Condition Reimbursables that were in some cases not provided for in the CMA or which exceeded the limits for such reimbursables," and that the City paid "some if not all of these charges." It concluded that this was inequitable and that the City was thus entitled to a refund. But the court did not find that this was a breach—its opening conclusion of law was that the "City has failed to prove its breach of contract claim against Petra." The City argues on appeal that overcharging is not only a breach, but a material breach. Petra's response does not address why overcharging would not be a breach. Rather, it simply characterizes the overcharging as "inadvertent."

We find that overcharging was clearly a deviation from the parties' agreement. Thus, though it may not have been material, it was a breach nonetheless. We therefore conclude that the district court erred by not finding that Petra's overcharging was a breach.

A breach of contract is the "[f]ailure, without legal excuse to perform any promise which forms the whole or part of a contract." *Fox v. Mountain W. Elec., Inc.*, 137 Idaho 703, 711, 52 P.3d 848, 856 (2002) (quoting BLACK'S LAW DICTIONARY 188 (6th ed. 1990)). A material breach, on the other hand, is "more than incidental and touches the fundamental purpose of the

18

contract, defeating the object of the parties entering into the agreement," and will allow the non-breaching party to rescind the contract. *Borah*, 147 Idaho at 79, 205 P.3d at 1215; *see also Ervin Const. Co. v. Van Orden*, 125 Idaho 695, 699–700, 874 P.2d 506, 510–11 (1993).

In this matter, the CMA plainly spells out the parties' agreement with regard to General Conditions reimbursables: "Owner shall reimburse Construction Manager for the 'general conditions' items designated for procurement by the Construction Manager under the Construction Management Plan at the cost thereof incurred by the Construction Manager." The resulting analysis is not complicated: if a breach is a failure to perform part of a contract and Petra charged the City for reimbursables beyond what was allowed by the contract, then the conclusion that Petra breached the CMA is a syllogism. It is problematic here, however, that the district court failed to exactly identify what those overcharges were. But, given that Petra does not dispute that overcharges occurred,[2] this factual point has been conceded. We accordingly find that the undisputed overcharges made by Petra, in contravention of the parties' deal, was a breach.

Despite the district court's erroneous conclusion that Petra had not breached the parties' contract, we find the error to be harmless. I.R.C.P. 61 provides, in relevant part:

> No error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Before the district court, in both its written closing argument and Proposed Findings of Fact and Conclusions of Law, the City argued that Petra had materially breached its contract, "wholly excusing" the City from Petra's claims for an equitable adjustment to the construction manager fee and/or additional reimbursable expenses. Petra correctly cited pertinent authority for the proposition that a party cannot insist upon the performance of a contract or a provision thereof when that party has materially breached the contract. *See, e.g.*, *Afton Energy, Inc. v. Idaho Power Co.*, 122 Idaho 333, 344, 834 P.2d 850, 861 (1992); *J.P. Stravens Planning Associates, Inc. v. City of Wallace*, 129 Idaho 542, 545, 928 P.2d 46, 49 (Ct. App. 1996).

---

[2] Petra even styles an argument heading in its brief: "The District Court Correctly Calculated the Amount of Overcharge."

The district court did not expressly address the City's claim that a material breach of the contract excused its performance. In such circumstances, we consider whether the district court made implicit factual findings and whether such implicit findings were supported by substantial and competent evidence. *Borah*, 147 Idaho at 79−80, 205 P.3d at 1215−16 (2009); *Walker v. Am. Cyanamid Co.*, 130 Idaho 824, 830, 948 P.2d 1123, 1129 (1997); *Nordstrom v. Diamond Int'l. Corp.*, 109 Idaho 718, 722–23, 710 P.2d 628, 632–33 (1985).

The district court made the following conclusion: "To the extent there were General Condition Reimbursables that exceeded the budgeted limits or were otherwise improperly charged to and paid by the City, the aggregate amount of such overpayments was $52,000.00 and increased the cost of the project by less than 1%." Similarly, the district court found that "[t]he grand total by which Petra's errors and/or omissions increased the cost of the project was less than 1%." These conclusions are evidently the district court's response to the City's claim that Petra's breaches were sufficiently material as to warrant excusing the City from any further obligations under the parties' contract.

Substantial and competent evidence supports the district court's implicit determination that Petra's overcharging was not a material breach. A material breach "defeat[s] the object of the parties entering into the agreement," and here, the City ultimately got what it wanted—a city hall building. And although there is a dispute over the amount of the overcharges,[3] even assuming that the overcharges totaled the maximum amount alleged by the City—$223,775.76— this would only be 1.03% of the total project price. Thus, even assuming the worst, the breach is incidental and not material.

In sum, we hold that Petra's overcharging the City was not a material breach of the CMA, but was a breach nonetheless, and reverse the district court's conclusion to the contrary.

3. <u>Payment and Performance Bonds</u>.

With regard to Petra providing a payment and performance bond for the Project, the district court found that the City had the right to demand that Petra obtain a bond, but that it declined to exercise this right. The court concluded that, instead, "Petra provided the City a $2 million errors and omissions liability insurance policy" and this was consistent with their agreement. The City argues on appeal that because Petra agreed to comply with all laws applicable to the Project, and because I.C. § 54-4512 required Petra to post a payment and

---

[3] Discussed more fully in Section **G**, *infra.*

performance bond, Petra's failure to secure a bond was a material breach of the agreement. The City's reply brief then introduces a related argument—that substitution of the errors and omissions policy, in light of the statutory requirement for a bond, results in an illegal contract.[4] Petra's response is that the district court correctly concluded that the "onus [was] on the City" to request a performance bond and, because the City did not, there was no material breach. In any event, Petra contends that because the City provided no evidence it suffered any damage from having insurance, as opposed to a bond, the City has "no legitimate claim to reversible error."

> The generally stated rule regarding illegal contracts is that:

> An agreement which cannot be performed without a violation of the law is illegal and void, whether or not the parties knew the law. However, under some authority, where a contract could have been performed in a legal manner as well as in an illegal manner, it will not be declared void because it was in fact performed in an illegal manner, at least if the performance is not seriously injurious to the public order. Nor will a contract be declared void because it might have been performed in an illegal manner, since bad motives are never to be imputed to any person where fair and honest intentions are sufficient to account for his or her conduct.

17A AM. JUR. 2D *Contracts* § 228 (footnotes omitted). Put differently, "a contract [that] cannot be performed without violating applicable law is illegal and void." *Id.* at § 229.

This Court has similarly found that "[a]n illegal contract is one that rests on illegal consideration consisting of any act or forbearance which is contrary to law or public policy." *Quiring v. Quiring*, 130 Idaho 560, 566, 944 P.2d 695, 701 (1997). Furthermore, contracts prohibited by law are illegal "and hence unenforceable." *Id.* This Court has also held that contracts that are "made for the purpose of furthering any matter or thing prohibited by statute . . . [are] void. This rule applies to every contract which is founded on a transaction *malum in se*, or which is prohibited by statute, on the ground of public policy." *Porter v. Canyon Cnty. Farmers' Mut. Fire Ins. Co.*, 45 Idaho 522, 525, 263 P. 632, 633 (1928). This Court has further stated that "if [a] contract is not separable and if any of its elements are tainted with illegality, albeit slight, the plaintiff cannot recover." *Trees v. Kersey*, 138 Idaho 3, 9, 56 P.3d 765, 771 (2002). Finally, we have held that "a contract will be enforced even if it is incidentally or indirectly connected with an illegal transaction provided it is supported by an independent consideration so that the

---

[4] The City also inexplicably notes that the allegedly illegal provision "is expressly severable by reason of Section 10.18 of the CMA." By contending that "[a]ny agreement [such as this] is void," and then pointing out the contract language stating that the agreement "shall not be affected" by unenforceable provisions, the City is essentially arguing against itself at this point.

plaintiff will not require the aid of the illegal transaction to make out his case." *Vancil v. Anderson*, 71 Idaho 95, 102, 227 P.2d 74, 77 (1951).

> The statute at issue here provides:

> A licensed construction manager or firm providing public works construction management services shall be required to post a payment and performance bond or bonds in the amount of the total construction management contract to secure the construction manager's obligations thereunder.

I.C. § 54-4512. The CMA states that "[i]f and when requested by Owner, Construction Manager shall provide Owner with a payment and performance bond or bonds in the amounts requested by Owner to secure the construction manager's obligations hereunder" and that "Construction Manager shall provide errors and omissions liability insurance on an aggregate limits 'claims made' basis in an amount not less than Two Million Dollars ($2,000,000)." Further, the CMA provides, "Construction Manager shall perform all of Construction Manager's services in compliance with all applicable laws, ordinances, rules, regulations or orders of any public authority having jurisdiction over the Project."

With respect to I.C. § 54-4512, both parties violated its requirement to provide a performance bond. The parties' disagreement here centered on the statute's wording. It arguably is telling construction managers that they "shall" obtain a bond, or, alternatively, that owners "shall *require*" construction managers to obtain a bond. Our reading is that it requires both the construction manager and the owner to ensure that the manager is bonded. Parties cannot, as they attempted here, get around this requirement by contract.

But Petra's failure to obtain a performance bond does not void the entire agreement between the parties. As noted, the general principle is that an illegal contract is one "which cannot be performed without a violation of the law." But here, the CMA gave Petra the option to secure a bond and provided a contractual mechanism for doing so. The CMA was thus fully capable of being performed without violating I.C. § 54-4512—the parties simply failed to do so. Further, there is no evidence that this agreement was "made for the purpose of furthering any matter" prohibited by statute, or that it was "founded" on something illegal. The parties' goal was to construct a building, not to circumvent the State's performance bond statute. The principle from *Kersey*—that even slight illegality will taint a non-separable contract—would not apply here because the CMA in fact had a severability clause.

22

Our holding in *Farrell v. Whiteman*, 146 Idaho 604, 200 P.3d 1153 (2009), wherein we found an architectural agreement illegal, would not apply to these facts. In *Farrell*, the statute explicitly required licensing not just for practicing architecture, but for offering to practice. A mere offer to provide unlicensed architectural services would thus be illegal and, consequently, an agreement between an unlicensed architect and a client was necessarily void. Idaho Code § 54-4512, on the other hand, gives no time frame for securing a bond—it only provides that construction managers must post one while providing services on public works projects. We offer no opinion as to the most commercially sensible time for a construction manager to obtain a performance bond. However, we think it is obvious that I.C. § 54-4512 does not require construction managers to be bonded before the contract is even formed. Thus, when the parties executed the CMA, it was a completely legal agreement, which only later was performed in violation of the bonding statute. This is in contrast to the situation in *Farrell*, where the services were rendered "pursuant to an illegal contract" because the contract violated the statute from the moment it was executed—it was impossible to legally perform. *Farrell*, 146 Idaho at 610, 200 P.3d at 1159. The statutory violation here is wholly different and will not render void a legal agreement that could have been performed legally.

However, the CMA did require Petra to comply with all applicable laws in performing its services. Because Petra's failure to obtain a bond violated a state statute, this was a breach of the CMA. That being said, there is no evidence that the default affected the parties or the Project in any way. The City reinforces this point by failing to support its argument that the breach was material and not adducing any evidence that the lack of a bond damaged it. We hold that Petra's failure to secure a bond was a breach of the CMA, and the district court's conclusion to the contrary was error. However, we affirm the district court's finding that the failure to obtain a bond was harmless with respect to the City.

4. Inspection, Rejection, and the Substantial Completion Process.

The City further alleges that Petra breached the parties' agreement by failing to inspect various contractors' work, failing to reject deficient work, and failing to comply with the substantial completion procedures. The district court concluded that Petra agreed to observe, but not inspect, contractors' work, and to reject that which was not compliant. But the court also found that Petra did not guarantee the contractors' work. Instead, it found that each contractor agreed to, and did, give the City a warranty. With respect to the substantial completion process,

23

the district court found that Petra met its duty by asking "[the Architect] to issue a certificate of substantial completion, but [the Architect] did not do so." The court determined that Petra met its duty to observe and kept the City well informed, and it thus concluded that:

> Petra and [the Architect] worked together to develop punch lists of items that needed to be corrected and all items were corrected. [] Any items remaining after the punch list items were closed out were warranty items. [] Every prime contractor gave the City a warranty for their workmanship and materials.

The City contends on appeal that the CMA required Petra, and the Architect, to do all things necessary, appropriate or convenient to achieve the City's ends. With respect to substantial completion, the City argues, "Petra and the Architect . . . each had the express, affirmative duty to certify in writing when the work under each of the 52 contracts . . . was sufficiently complete in accordance with the Contract Documents." Additionally, the City claims that Petra had a duty to inspect the contractors' work, and had to certify in writing that the work complied with the contract documents. Finally, the City alleges that the CMA bound Petra to require the Architect to certify substantial completion and that, when the Architect did not, "Petra did nothing." This, it argues, was "yet another material breach."

Petra responds that the Project was substantially complete in fact—that the City issued certificates of occupancy, conducted city business within the new building, and so on. It further contends that, although the Architect failed to issue a certificate of substantial completion, that failure caused no real harm, as all the contractors warranted their work in the typical fashion. Finally, with regard to Petra's alleged duty to observe or inspect the work, Petra avers that it fulfilled all its duties through the extensive punch list process that the parties went through, "including addressing non-conforming work."

Three intertwined issues are implicated here: 1) whether Petra had a duty to inspect the various contractors' work; 2) the scope of Petra's duty with regard to the Architect and issuance of certificates of substantial completion; and, 3) whether Petra properly rejected work that did not conform to the contract requirements. These issues relate solely to the parties' relationships with one another and are thus controlled by the contract documents. To begin with, the CMA states, "[t]he general scope of Construction Manager's responsibilities is to do all things, or, when appropriate, require Architect and each Contractor to do all things necessary, appropriate or convenient to achieve the end result desired by Owner." It additionally provides that

24

"Construction Manager shall carefully observe the Work of each Contractor whenever and wherever necessary, and shall, at a minimum, observe Work at the Project site no less frequently than each standard workday."

The A201, which is expressly incorporated into the CMA, says "[t]he Construction Manager will, for the benefit of the Owner, determine that the Work is being performed in accordance with the requirements of the Contract Documents, will keep the Owner informed of the progress of the Work, and will guard the Owner against defects and deficiencies in the Work." It goes on to state that the "Construction Manager . . . and Architect will not have control over or charge of and will not be responsible for construction means, methods, techniques, [etc.] in connection with the Work, since those are solely the Contractor's responsibility as provided in Section 3.3, *and neither will be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents.*" (Emphasis added.) However, Petra did have an obligation to "reject, in writing, any Work of a Contractor that is not in compliance with the Construction Documents unless otherwise directed by the Owner in writing."

With respect to the substantial completion process, the A201 defines "substantial completion" as "the stage in the progress of the Work as certified in writing by the Construction Manager and Architect, when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the Owner can occupy or utilize the Work for its intended use." Regarding the proper procedure for substantial completion, the A201 provides generally that the "Construction Manager will assist the Architect in conducting inspections to determine the dates of Substantial Completion and final completion, and will receive and forward to the Architect written warranties and related documents required by the Contract and assembled by the Contractor." The A201 then outlines in detail the Construction Manager's duties during substantial completion:

> When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor and Construction Manager shall jointly prepare and submit to the Architect a comprehensive list of items to be completed or corrected. The Contractor shall proceed promptly to complete and correct items on the list. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents. *Upon receipt of the list, the Architect, assisted by the Construction Manager, will make an inspection to determine whether the Work or designated portion thereof is substantially complete.* If the Architect's inspection discloses any item, whether or not included

25

on the list, which is not in accordance with the requirements of the Contract Documents, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. *The Contractor shall then submit a request for another inspection by the Architect, assisted by the Construction Manager, to determine Substantial Completion. . . .* Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work . . . .

(Emphasis added.)

There is substantial evidence in the record to support the finding that Petra complied with the various obligations set forth in the foregoing language. With respect to the substantial completion process, neither the CMA nor the A201 place a duty on Petra itself to submit certificates of substantial completion. Rather, the Architect was the person obligated to submit the certificates, and Petra agreed in the CMA that it would "require" the Architect to do so. And, Petra *did* require the Architect to issue certificates—the Architect simply failed to do so. Because it is undisputed that Petra asked the Architect to issue the certificates, Petra did not breach the agreement just because the Architect failed to live up to its own contractual obligation. Furthermore, the City never explains what damage it suffered from the Architect's failure to issue certificates. In fact, the CMA states that substantial completion is the stage of the deal in which the City beneficially occupies the building, and the A201 provides that following substantial completion, the owner will receive its warranties. Here, both of these things occurred.

Regarding inspection and rejection, Petra had a duty to "assist the Architect in conducting inspections." But, despite the City's averments, Petra had no express duty to inspect. A duty to assist another party does not necessarily mean one must do the other's work for them—assistance can be provided in myriad ways. Furthermore, Petra did indeed have a duty to "observe" the Project, but the verb choice here is telling. One assumes that the City, as drafter of the contract, could have written "inspect" with respect to Petra's obligation, just as it did for the Architect. The deliberate choice of a more passive verb suggests that Petra had a lesser duty than the Architect. Petra was obliged to observe the work and assist the Architect, but was not required to inspect the work.

Petra was not responsible for any contractor's failure to perform its work. That being said, Petra clearly did have an obligation to reject contractor work that did not comply with the contract documents. But substantial and competent evidence supports the district court's conclusion that Petra rejected, and caused to be corrected, all the work that did not conform to

26

the contract, and that any remaining errors were warranty items, and thus the responsibility of the contractors.

Petra was obliged to reject and correct items through a punch list process, and as the work was heading to completion in the summer of 2009, correspondence from both parties shows that a dwindling amount of punch-list items were left for correction. Final punch lists were subsequently closed out by the City's building inspectors. Indeed, Ed Ankeman, the city building inspector who signed the final punch list, testified that his signature meant that an item "was either repaired, replaced, or corrected in a satisfactory manner." Petra Project manager Tom Coughlin similarly testified that "a final punch list was narrowed down" and that any "outstanding items . . . were completed." And, the City's own purchasing agent admitted in an email to Petra, following the punch list process, that any remaining items were warranty items—the responsibility of the contractors.

In sum, substantial and competent evidence supported the district court's conclusion that Petra fulfilled its duties with regard to observation, rejection, and correction of nonconforming work, and that any remaining items were warranty items. Still, because the City belabored this issue at length, it is worth specifically addressing the various damage claims it made. In each instance Petra met its obligation, or the claimed error was a warranty item.

a. Masonry.

The City alleged multiple instances of deficient and defective masonry, which it claimed totaled over $1.2 million worth of damage and which Petra failed to reject and correct. The district court conceded that the masonry was indeed flawed in some places, but it nonetheless tended to believe Petra's expert, who stated that the cost to remedy it would amount to $6,000. The district court concluded that the mason "warranted its workmanship" and, thus by implication, Petra was not responsible for it.

Substantial and competent evidence supports the district court's conclusion that the masonry defects are a warranty item. The masonry was substantially completed on May 18, 2008. The contractor completed two punch lists for the masonry veneer, one of which was approved by the City and the Architect. The mason warranted its work, and, crucially, witnesses testified at trial that any remaining flaws indeed fell under that warranty. This Court will not disturb a district court's findings supported by competent and substantial evidence, even if

conflicting evidence exists. Thus, the district court's finding that the masonry defects were not Petra's responsibility will not be disturbed.

       b.   <u>Western Roofing</u>.

The City contends that the roof leaked "immediately upon installation" and "continues" to leak. The district court concluded that the roof's punch list was completed and warranties for it were issued. Further, it found that "any damage to the roof that was caused during construction was repaired at no cost to the City" and that "new" damage occurred subsequent to the parties' inspections of the roof.

Substantial and competent evidence shows that the roof damage is either a warranty item, and therefore the responsibility of the contractor, or was intentionally caused by a third party, and thus is not Petra's responsibility. Damage did occur to the roof during construction, but this was repaired at no cost to the City. Following construction, the Architect inspected the roof twice, and Petra closed out the associated punch list. Western Roofing, the contractor that installed the roof, and Versico, the contractor that designed the membrane material that covered it, both gave warranties for their work. Four months after the warranties were issued, new damage was discovered—one witness testified that the roof membrane was cut, "like somebody had taken a knife or a razor blade and cut some of the membrane."

In sum, whether the roof damage was a warranty item or intentionally caused, substantial and competent evidence supports the district court's conclusion that Petra is not responsible for it.

       c.   <u>Buss Mechanical</u>.

The City claims on appeal that Petra "knowingly allowed [Buss Mechanical] to install the wrong materials in the building." It contends that Buss installed the wrong kind of piping and, when Petra discovered it, "[n]ot only did Petra fail to reject to improper substitution of plastic for cast iron, it knowingly allowed the PVC to be used, and did nothing." It provides no citation to the record for this last contention.

Petra, on the other hand, does point to the record, which shows that when Petra discovered Buss Mechanical's error, it issued a "daily repair corrective notice" to substitute the correct pipe. This Court will not consider an argument not supported by cogent argument or authority. *Liponis v. Bach*, 149 Idaho 372, 374, 234 P.3d 696, 698 (2010). Thus, because the City

28

does not support its contention that Petra knowingly allowed installation of the wrong pipe and did nothing in response, we will not entertain this argument.

        d.   <u>HVAC</u>.

The City's arguments regarding Petra's duties with respect to the HVAC system are similarly unavailing. The City contends that the "Contract Documents" obligated Petra to obtain, review, and approve a Test Adjust and Balance Report, demonstrating that the HVAC system met all performance requirements. The problem with this assertion is that the contract does not actually say that Petra must do this. The Construction Management Plan—which was not incorporated into the CMA—alone states that the construction manager will "[s]ubmit test/adjust/balance records," and the City does not dispute that Petra did exactly that. Substantial, competent evidence shows that the records were submitted and that there was no "reason to retest and rebalance the HVAC system." Thus, the district court's conclusion that "complaints that the City has with . . . the HVAC system are more likely than not the result of operator error," rather than Petra's actions, will not be disturbed.

        e.   <u>Miscellaneous Alleged Items</u>.

The City cites various other instances where, it alleges, Petra failed to inspect or reject deficient work. It argues that the water feature, the floor access panels, and the mayor's office were all defective and deficient and should have been rejected or repaired by Petra. The district court, however, found that any errors here were the result of design flaws, improper installation, or were simply warranty items, respectively. All of these findings were supported by substantial, competent evidence. Thus, the district court's findings regarding these items, and its conclusion that Petra was not liable for their correction will not be disturbed.

        5.   <u>Liquidated Damages</u>.

The City also argues that Petra breached the parties' agreement with respect to liquidated damages. But, because the City provides virtually no authority to support this issue, the Court will not consider it. We "will not consider issues cited on appeal that are not supported by propositions of law, authority or argument." *Woods v. Sanders*, 150 Idaho 53, 60, 244 P.3d 197, 204 (2010). Put another way, even if "an issue is explicitly set forth in the party's brief as one of the issues on appeal, if the issue is only mentioned in passing and not supported by any cogent argument or authority, it cannot be considered by this Court." *Bach*, 149 Idaho at 374, 234 P.3d at 698.

29

Although the City is obligated to support its contentions with propositions of law, authority, and argument, here it achieves the somewhat dubious trifecta of lacking all three. The City states that "as a matter of [agency] law, Petra had a duty to enforce all provisions of each Prime Contract, including the liquidated damages provisions"—but then cites no law to that effect. It then contends that "each of the 52 Prime Contracts . . . contained the same liquidated damages provision"—but provides not one cite to the record, let alone 52. Finally, the City argues that Petra had "an express contractual duty to advise the City when the liquidated damages provision had been triggered"—but does not point to contract language which so states. This final omission, unhelpful though it may be, exists for good reason—we find no contractual provision that expressly requires Petra to do so. Indeed, although the prime contracts do allow the City to assess liquidated damages, it just provides this as an option. Thus, even the City itself had no duty to enforce the provision, just the ability.

At one point in its briefing, the City expressed its familiarity with "the more than 160,000 pages" that comprise this case's record. One can only presume, then, that if points of authority are conspicuously missing from its argument, they must simply not exist. In any event, this Court is not required to go fishing through the record on counsel's behalf. Instead, we simply do not consider this unsupported argument on appeal.

6. <u>The Project Schedule</u>.

Another breach alleged by the City pertains to the Project schedule. On this point, the district court concluded that Petra timely completed its work and that the City moved into Meridian City Hall "within the originally contemplated eighteen month construction time estimate." On appeal, the City argues that the CMA contained a "time-is-of-the-essence" clause, so failure to adhere to the contract's timeframe is a material breach. Petra responds that the CMA provides for two phases of construction—preconstruction and construction—and that the construction time of 17.4 months complied with the CMA requirements. Petra fails to address whether the preconstruction phase was similarly timely and compliant.

The CMA does provide upfront that "[t]he time limits established by the Project Schedule are of the essence and shall not be exceeded by the Construction Manager without Owner's prior written consent or as permitted in Section 5.2 below." Section 5.2 then goes on to detail the various circumstances that might justify a delay to the Project, and for which the work schedule will be "equitably adjusted."

30

Despite this language regarding scheduling, the CMA never explicitly sets forth a Project timeframe. Instead, in a section discussing reimbursable expenses, it provides the following:

> If the size (i.e., 80,000 square feet), complexity (i.e., four story, surface parking), Owner's schedule (i.e., six months Preconstruction Phase Services, eighteen months Construction Phase Services), . . . and/or bidding process (i.e., two bid packages, no rebids) materially changes, Owner and Construction Manager agree that the not-to-exceed limits set forth below shall be adjusted up or down accordingly . . . .

Thus, the CMA implies that preconstruction will last for 6 months and that construction will last for eighteen months, but it gives no indication of when these timeframes begin, or whether they were meant to run concurrently.

Given the fuzziness of the timeframe set forth by the CMA, there is substantial and competent evidence that Petra complied with it. Preconstruction services started on July 5, 2006, and ended on January 1, 2007—well within the six month limit. Similarly, the construction phase started on May 7, 2007, and ended on October 15, 2008, which was within eighteen months. The City's argument regarding the time-is-of-the-essence clause would not change this, as the clause is immediately followed up by a provision detailing how the parties could adjust the Project schedule and providing mechanisms for dealing with delays. Thus, the extra-jurisdictional authority cited by the City, in which that contract expressly "provide[d] that 'time is of the essence for every provision of the agreement,'" is distinguishable from the agreement here. *See Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1082 (E.D. Va. 2011).

Although there is some conflicting evidence regarding the Project schedule, substantial and competent evidence supports the district court's conclusion that Petra timely completed its work. Thus, we affirm the district court's conclusion that Petra did not breach the party's agreement with respect to the Project schedule.

**G. The district court's calculation of the damage offset, attributable to Petra's overcharge, was proper**.

As noted above, Petra's overcharges were a breach of the parties' agreement. Although the district court did not find that a breach occurred, it nevertheless concluded:

> 92.    Petra charged Meridian for a number of General Condition Reimbursables that were in some cases not provided for in the Construction Management Plan or which exceed the limits for such reimbursables. Meridian paid some if not all of these charges.

31

93. It is exceptionally difficult and time consuming, if not impossible, to calculate precisely the amount of General Condition Reimbursables Meridian overpaid Petra.

94. It would be inequitable to allow Petra to retain that money.

95. While the amount is somewhat imprecise, the Court has calculated with reasonable accuracy and without resorting to speculation that the sum total of the overpayments was $52,000.00.

The City challenges this determination on appeal and alleges that the overcharge figure is "speculative and arbitrary" and the result of "nothing more than guesswork" on the part of the district court. It then performs its own calculations, with references to the record, and arrives at a total of $223,775.76 worth of overcharges. Petra responds by citing *Browning v. Ringel*, 134 Idaho 6, 14, 995 P.2d 351, 359 (2000), for the proposition that a trial court need not "provide a lengthy discussion on every . . . specific factual issue" in a matter. Thus, Petra argues, the district court's overcharge figure is correctly calculated, and adequately supported.

It is the province of the district court—and not this Court—"to weigh conflicting evidence and testimony and to judge the credibility of the witnesses." *Beckstead v. Price*, 146 Idaho 57, 61, 190 P.3d 876, 880 (2008). Accordingly, "[a] trial court's findings of fact in a bench trial will be liberally construed on appeal in favor of the judgment entered, in view of the trial court's role as trier of fact." *Id.* With respect to its findings, "the trial court is not required to provide a lengthy discussion on every single piece of evidence and every specific factual issue involved in the case." *Browning*, 134 Idaho at 14, 995 P.2d at 359 (2000). Applying this rule in *Browning*, the Court determined that the district court's findings of fact there were "more than sufficient":

> The [district] court examined all the evidence, both testimonial and documentary, made reasonable inferences from that evidence and then drafted detailed findings of fact and conclusions of law based on that evidence after having reviewed both parties' proposed findings and conclusions. The court's findings of fact and conclusions of law are sufficient to fulfill the purpose of I.R.C.P. 52(a) which is "to provide the appellate court with a clear understanding of the trial court's decision so that it may determine whether the trial court applied the proper law in reaching its ultimate judgment."

*Id.* (quoting *The Highlands, Inc. v. Hosac*, 130 Idaho 67, 70, 936 P.2d 1309, 1312 (1997)).

Here, despite the district court's admission that its overcharge calculation was "imprecise," we affirm. The district court was not required to make its calculation with utmost

precision—instead, its only charge was to provide this Court with a clear understanding of its decision, such that we can conclude that it properly applied the law. We conclude that it did.

Though the district court does not share its exact figures on this one point, the depth of detail contained throughout its opinion makes it clear to us that the court properly applied long-accepted rules regarding damages. The district court generated over 22 pages of meticulous factual findings in its opinion, which leaves us with a clear understanding of how it applied the law. We understand that the court calculated, as best it could, the amount which the City was overcharged. This amount reflected the loss suffered due to Petra's breach. The court then compensated the City by reducing Petra's damage award accordingly. This comports with very basic contract law principles. *See, e.g.*, *Hummer v. Evans*, 129 Idaho 274, 280, 923 P.2d 981, 987 (1996) (noting that "the measure of damages is such as will compensate for the loss suffered as the result of a breach of contract"). We conclude that the district court did not "resort[] to speculation," and properly calculated the offset, despite the lack of comprehensive bookkeeping.

**H. The district court did not err in allowing the testimony of Tim McGourty**.

The City alleges error on appeal regarding the trial testimony of Tim McGourty. McGourty is the President of TMC, which was the masonry contractor for the Project. In allowing McGourty's testimony regarding the masonry, the district court treated him as a "fact witness," and not an expert, because McGourty was testifying as to the amount of an estimate that he had previously prepared. The City poses several arguments on appeal: that McGourty was not a fact witness, but an expert witness, and thus should have been disclosed; that McGourty was a lay witness offering an opinion that was not based on "perceptions"; and that the court failed to exercise any reason in allowing his testimony. Petra responds in agreement with the district court, arguing that McGourty and an estimator prepared an estimate of the masonry repairs and that "[t]he Court properly allowed him to provide 'factual testimony'—what he did; what he prepared; what it was based on; what the estimate was."

The decision "to exclude undisclosed expert testimony pursuant to I.R.C.P. 26(e)(4) is committed to the sound discretion of the trial court." *Schmechel v. Dillé*, 148 Idaho 176, 180, 219 P.3d 1192, 1196 (2009). "The test for determining whether a district court abused its discretion is: (1) whether the court correctly perceived that the issue was one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether it reached its

33

decision by an exercise of reason." *Id.* at 181, 219 P.3d at 1197. Concerns are heightened when expert testimony is involved, as this Court noted in *Radmer v. Ford Motor Co.*, 120 Idaho 86, 813 P.2d 897 (1991):

> In cases [involving expert testimony], a prohibition against discovery of information held by expert witnesses produces in acute form the very evils that discovery has been created to prevent. Effective cross-examination of an expert witness requires advance preparation . . . Similarly, effective rebuttal requires advance knowledge of the line of testimony of the other side. If the latter is foreclosed by a rule against discovery, the narrowing of issues and elimination of surprise which discovery normally produces are frustrated.

*Id.* at 89, 813 P.2d at 900 (quoting Advisory Committee Notes, Rule 26, Fed. Rules Civ. Proc., 28 U.S.C.A.).

Given that McGourty was not an expert witness, it was within the district court's discretion to admit his testimony. As pointed out by the district court, McGourty was not offering an expert opinion, or a lay opinion—he was simply testifying that he went to the job site, inspected it, and prepared an estimate of a certain amount. Thus, the intensified concerns regarding undisclosed expert opinions would not be triggered here. Furthermore, the record suggests that the delay in disclosing McGourty was due to the City's own tardiness in revealing its evidence regarding damages. In any event, the choice to exclude was left to the district court's sound discretion, which it properly exercised. First, the court recognized it had the discretion to exclude by reserving a ruling on the City's motion until trial, where it would consider whether McGourty was not a "fact witness[], but rather [an] expert witness." Second, the court acted consistently with the Idaho Rules of Evidence, which distinguish between witnesses who have "personal knowledge" versus expert or lay witnesses offering opinions. *Compare* I.R.E. 602, *with* I.R.E. 702, *and* I.R.E. 701. Lastly, the court reached its conclusion by an exercise of reason—it determined that because McGourty was testifying regarding facts that he had personal knowledge of, he was not an expert and was not offering an opinion. Therefore, allowing his testimony was proper. Consequently, we hold that the district did not err in allowing McGourty to testify.

## I. The district court did not err by disregarding the City's damages evidence.

In assessing the various damage amounts alleged by City experts, the district court found that "damages attributed to Petra were speculative." The City contests this on appeal, arguing that the court was required to expressly find that City damage experts were not credible, or that

they gave improbable testimony, in order to conclude their testimony was speculative. This issue can be quickly disposed of as irrelevant because the City was unable to establish liability on the part of Petra for any of its damage claims. In order for the issue of damages testimony to be relevant, a party must be able to establish liability. We have upheld the district court's determination that Petra is not liable to the City on its myriad damage claims and, therefore, we need not address this issue.

### J. The district court did not err in not allowing the City to amend its Complaint.

The City asserts that the district court erred in not allowing the City to amend its Complaint to add additional claims. In ruling on the City's Motion to Amend, the district court held that:

> [T]he Court is not persuaded that the evidence found in the record is sufficient to provide Meridian a reasonable likelihood of proving the fraudulent and outrageous behavior that evidence a bad act and bad intent required by the case law and the statute. Therefore, Meridian's Motion for leave to file a First Amended Complaint to add a claim for punitive damages is DENIED.

The City alleges that the district court incorrectly applied the above standard, which it argues is a "summary judgment" standard, rather than a more liberal "motion to amend standard." Petra responds that the district acted within its "proper discretion," but that, even if it did not, the error was harmless because "the City does not refer to any evidence to support its fraud and related theories."

Trial courts must exercise "[g]reat liberality . . . in permitting amendments to pleadings." *Markstaller v. Markstaller*, 80 Idaho 129, 134, 326 P.2d 994, 997 (1958). That being said, "[a]n application to amend a pleading is directed to the sound discretion of the court." *Id.* This Court has further explained that "[g]ranting or refusing to grant persmission [sic] to amend a pleading is largely a matter of discretion of the trial court, and, unless the exercise of such discretion deprives a party to the action of some substantial right, it is not error." *Id.* (quoting *Cady v. Keller*, 28 Idaho 368, 154 P. 629, 631 (1916)). The *Markstaller* Court noted that, there, "the complaint [was] capable of being amended to state facts sufficient to constitute a cause of action [and] a refusal to grant permission to amend would deprive appellant, a party to the action, of a substantial right" and, therefore, this Court allowed amendment. *Id.* at 135, 326 P.2d at 997.

Here, the district court did not err in not allowing the City to amend its Complaint. The City averred that the district court was required to apply a "liberal" standard in reviewing its

motion. This is not entirely accurate. The district court was required to deploy liberality, but the ultimate decision of whether to grant or deny was at its sound discretion. The City alleges essentially that the district court did not consider each of the proposed claims fully enough, but it does not explain why such an approach would be an abuse of discretion. More fundamentally, the City also fails to allege what substantial right the district court's decision deprived it of, or what harm resulted therefrom. The district court did not err by not granting the City permission to amend its Complaint.

### K. The district court did not err in awarding attorney fees.

The CMA states that, "in the event of any controversy, claim or action . . . the prevailing party will be entitled to receive from the other party all costs, damages, and expenses, including reasonable attorneys' fees." The City argues on appeal that the district court erred in granting attorney fees to Petra. It first contends that Petra should not have prevailed in the first place and thus should not have won fees. It then argues "the [district court] erred . . . as a result of its failure to perform *any* of the analysis required by Rule 54" and instead "[appeared to rely] exclusively upon the Contract as the basis for the award of the entirety of the fees and costs claimed by Petra." Petra responds that the award of costs and fees was proper and conformed to the requirements of Rule 54. The district court found that Petra was the prevailing party, and, absent a "rare" case of abuse of discretion, this Court will not disturb that finding on appeal. *Crump v. Bromley*, 148 Idaho 172, 173, 219 P.3d 1188, 1189 (2009).

The City's lack of effort in making this argument is noteworthy. It contends that Rule 54(e) requires the district court to perform an analysis, but does not state what the analysis is. It then states that the district court did not "perform *any* of the analysis required by Rule 54," but cites to no record authority to support that claim. It argues that "it appeared that the [district court] relied exclusively upon the Contract as the basis for the award" and that the district court "did not engage in any of the required analysis"—and for both points, provides no authority whatsoever.

Per *Woods* and *Bach*, this Court need not consider unsupported arguments on appeal. However, even if the City had properly presented the argument that the district court was required to consider Rule 54(e)(3) factors, the record shows that the district court *did* consider them. Rule 54(e)(3) states that:

In the event the court grants attorney fees to a party or parties in a civil action it shall consider the following factors in determining the amount of such fees:

(A) The time and labor required.
(B) The novelty and difficulty of the questions.
(C) The skill requisite to perform the legal service properly and the experience and ability of the attorney in the particular field of law.
(D) The prevailing charges for like work.
(E) Whether the fee is fixed or contingent.
(F) The time limitations imposed by the client or the circumstances of the case.
(G) The amount involved and the results obtained.
(H) The undesirability of the case.
(I) The nature and length of the professional relationship with the client.
(J) Awards in similar cases.
(K) The reasonable cost of automated legal research (Computer Assisted Legal Research), if the court finds it was reasonably necessary in preparing a party's case.
(L) Any other factor which the court deems appropriate in the particular case.

I.R.C.P. 54. Not only did the district court expressly refer to Rule 54(e) in its holding awarding fees, but its justification for doing so was comprised entirely of the above factors:

> The CMA clearly states that attorneys' fees must be reasonable in order to be awarded. Petra seeks $1,275,416.50 in attorneys' fees, and the Court finds these fees to be reasonable. This case was litigated for more than two years. It involved more than a dozen vigorously contested pre-trial motions. The trial lasted fifty-nine (59) days. Petra's lead attorneys, Mr. Walker and Ms. Klein, are experienced litigation attorneys, having practiced law for thirty-five (35) years and thirteen (13) years, respectively. Their fees are consistent with similarly experienced attorneys in this jurisdiction. The range of issues presented and defended was exhaustive, and often required both parties to work within confined time frames. For all these reasons, the Court finds the requested attorneys' fees were both reasonable and reasonably incurred.

Thus, beyond being spectacularly unsupported, the City's arguments on this issue are simply wrong. Consequently, we will not disturb the district court's award of fees.

**L. As prevailing party, Petra is entitled to attorney fees on appeal.**

Both parties argue entitlement to attorney fees on appeal. This Court determines prevailing party status "from an overall view, not a claim-by-claim analysis." *Crump*, 148 Idaho at 174, 219 P.3d at 1190 (quoting *Shore*, 146 Idaho at 914, 204 P.3d at 1125). Furthermore, if "both parties are partially successful, 'it is within the court's discretion to decline an award of attorney fees to either side.'" *Id.*

We hold that from an overall view Petra is the prevailing party. The City brought a wide range of claims on appeal, the vast majority of which were unavailing. And, although two of the district court's rulings are reversed in the City's favor, they are minor issues. We have left intact practically all of the district court's findings and conclusions and not modified any of its monetary awards. We consequently find that Petra is the prevailing party on appeal.

The CMA executed by the parties provided that the prevailing party would be entitled to attorney fees. Thus, we grant Petra its attorney fees on appeal.

IV.
## CONCLUSION

We affirm the judgment and award Petra costs and attorney fees on appeal.

Chief Justice BURDICK, and Justices EISMANN and HORTON, Justice Pro Tem KIDWELL CONCUR.